IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

ROBERT GRIZZLE,                          §
Institutional ID No. 1998719,            §
                                         §
          Plaintiff,                     §
                                         §    CIVIL ACTION NO. 5:22-CV-017-BQ
v.                                       §
                                         §
BRYSON MCINTIRE, *et al.*,               §
                                         §
          Defendants.                    §

## ORDER TO ANSWER AND FOR PARTIAL DISMISSAL

Proceeding pro se and *in forma pauperis*, Plaintiff Robert Grizzle brings this action under

42 U.S.C. § 1983, alleging violations of his constitutional rights, as well as his rights under the

Americans with Disabilities Act (ADA) and Rehabilitation Act (RA), while incarcerated at the

Preston Smith and John Montford Units of the Texas Department of Criminal Justice (TDCJ). *See*

Compl. 3, 17–45, ECF No. 1.[1]  He seeks declaratory relief and monetary damages. *Id.* at 46.

Grizzle filed his Complaint on February 14, 2022. ECF No. 1. The United States District

Judge granted Grizzle's Application to Proceed *In Forma Pauperis* (ECF Nos. 2, 5) and transferred

this case to the undersigned United States Magistrate Judge for further proceedings. ECF No. 6.

The undersigned thereafter reviewed Grizzle's Complaint, as well as authenticated records

provided by TDCJ, and held an evidentiary hearing on April 14, 2022, in accordance with *Spears*

*v. McCotter*, 766 F.2d 179, 181–82 (5th Cir. 1985). ECF Nos. 8, 9, 10.

Grizzle has consented to proceed before a magistrate judge. ECF No. 11. After considering

Grizzle's allegations in his Complaint, his testimony at the *Spears* hearing, authenticated records

---

[1] Page citations to Grizzle's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

provided by TDCJ, and applicable law, the Court finds that Grizzle's ADA/RA claims against the State of Texas and TDCJ, as well as his excessive force claim against Defendant McIntire, survive preliminary screening under 28 U.S.C. §§ 1915 and 1915A. As to Grizzle's remaining allegations against all other Defendants, however, the Court concludes that such claims must be **DISMISSED** in accordance with 28 U.S.C. §§ 1915 and 1915A.

## I.      Standard of Review

A court must dismiss a complaint filed *in forma pauperis* by a prisoner against a government entity or employee if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (2017); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly fanciful or baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005). When analyzing a prisoner's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated prison records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (explaining that responses to a questionnaire or testimony given during an evidentiary hearing are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (per curiam) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based

on "medical and other prison records if they are adequately identified or authenticated" (internal quotations omitted)).

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II.   Discussion

### A.  Grizzle's Claims and Authenticated Records

Grizzle asserts claims against fifty-seven Defendants:  (1) the State of Texas; (2) TDCJ; (3) TDCJ Director Bryan Collier; (4) Smith Unit Warden Jim Webb; (5) Smith Unit Assistant Warden Cody Parker; (6) Smith Unit Assistant Warden Michael Miller; (7) Smith Unit Captain Bryson McIntire; (8) Smith Unit Sergeant Gerardo Sanchez; (9) Smith Unit Sergeant Rene Robles; (10) Smith Unit Correctional Officer (CO) Maria Guerra; (11) Smith Unit CO Ruben Garcia; (12) Smith Unit CO Clemente Olvera III; (13) Smith Unit CO Anthony Taylor; (14) Smith Unit Medical Director Terri Rose; (15) Smith Unit Nurse Kelly Brown; (16) Smith Unit Nurse L. Smith; (17) Smith Unit Nurse Jessica Rojas; (18) Montford Unit Warden Andrea B. Lozada; (19) Montford Unit Assistant Warden David Reed Jr.; (20) Montford Unit Captain Adam Ybarra; (21) Montford Unit Captain Michael Session; (22) Montford Unit Captain Bryan L. Luna; (23) Montford Unit Sergeant Amber Hansen; (24) Montford Unit Sergeant Devin Esquivel; (25) Montford Unit Sergeant Jericka Evans; (26) Montford Unit Major Ricardo Ramirez;

(27) Montford Unit CO Madison Hendricks;[2] (28) Montford Unit CO Robin Bolla; (29) Montford Unit CO Steven Hammond; (30) Montford Unit CO Aaron Baughman; (31) Montford Unit CO Jordan Chavez; (32) Montford Unit CO Rachel Longoria; (33) Montford Unit CO Forrest Milton; (34) Montford Unit CO Nathan Shaffer; (35) Montford Unit Doctor Ricky T. Burreslia; (36) Montford Unit Psych Counselor Lindsey Hummel; (37) Montford Unit Nurse Jane Doe #1; (38) Montford Unit Nurse Jane Doe #2; (39) Montford Unit Nurse Jane Doe #3; (40) Montford Unit CO Jane Doe #4; (41) Montford Unit Nurse Jane Doe #5; (42) Montford Unit Nurse Jane Doe #6; (43) Montford Unit Nurse Jane Doe #7; (44) Jane Doe #8; (45) John Doe #1; (46) Montford Unit CO John Doe #2; (47) Montford Unit Captain John Doe #3; (48) Montford Unit Sergeant John Doe #4; (49) Montford Unit Lieutenant John Doe #5; (50) Montford Unit Nurse John Doe #6; (51) Smith Unit CO John Doe #7; (52) John Doe #8; (53) Smith Unit CO John Doe #9; (54) Montford Unit Nurse John Doe #10; (55) John Doe #11; (56) John Doe #12; and (57) John Doe #13. Compl. 1, 3, 6–8, 11–16, 18. Grizzle sues the individually named Defendants in both their individual and official capacities. *Id.* at 33.

In all, Grizzle believes one or more Defendants: (1) were deliberately indifferent to his serious medical needs; (2) used excessive force; (3) interfered with his ability to practice his religion; (4) subjected him to unconstitutional conditions of confinement; (5) violated his due process rights by failing to follow institutional rules; and (6) violated his rights under the ADA and RA. *Id.* at 35–45; *see also* Tr. 2:44:38–:46:07.[3] Grizzle also brings supervisory liability claims based on the foregoing alleged violations of his rights. *Id.*

---

[2] Grizzle refers to this Defendant as both "Hendricks" and "Kendricks." *Compare* Compl. 24 ("Hendricks manhandled me out of the shower . . . ."), *with* Compl. 37 ("Kendricks . . . manhandl[ed] me out of the shower . . . ."). The Court refers to this Defendant as Grizzle first identifies her—i.e., Hendricks. *See id.* at 1.

[3] Citations to the transcript reference the Court's audio recording of the evidentiary hearing held April 14, 2022.

Grizzle's troubles began in May 2021 when an unnamed person injured his right kneecap using a makeshift axe "in retaliation for being accused of being a snitch." Compl. 17.[4] At the time Grizzle was incarcerated at the Barry Telford Unit. Tr. 2:44:38–:46:07. Soon thereafter Grizzle was transferred to the Smith Unit where the alleged constitutional violations giving rise to this action began. *Id.*

Grizzle alleges that he has "[b]een complaining about knee problems since arriving [at the Smith Unit] in July or August [20]21." Compl. 17. On September 24, 2021, Grizzle re-injured his knee and groin while lifting weights "in an attempt to make [his] leg stronger." *Id.* at 18. He went to medical where Defendant Jane Doe #6 purportedly refused to complete an injury report, "failed to examine [him,] failed to ask any questions, [and] ignored [his] complaints of pain."[5] *Id.* Grizzle acknowledges, however, that Defendant Jane Doe #6 called a telehealth provider who in turn ordered Grizzle a cane, medical shower pass, ice, and a 30-day prescription for Naproxen, but otherwise did not examine him. *Id.* at 18–19; *accord* Tr. 2:50:17–:50:31, 2:53:27–:53:35. According to authenticated records, Grizzle had additional medical appointments on September 25 and 26 concerning his claimed injury.

A few days later, on September 27, Grizzle had a medical appointment scheduled, but Defendants Olvera, Robles, and Garcia allegedly refused to allow him out of his cell, instead laughing at him when he showed Robles and Olvera two "deep[,] large cuts" on his right calf.

---

[4] As required for screening, the Court accepts as true Grizzle's following assertions—it makes no findings as to their veracity.

[5] Grizzle's Complaint alleges that he visited with Defendant Jane Doe #6 twice that day: she refused to complete an injury report during the first visit, he returned to his cell, fell in the shower, and returned to medical a second time. Compl. 18–19. At the evidentiary hearing, however, when asked about Defendant Jane Doe #6's refusal to complete an injury report, Grizzle testified, "I went to medical. They didn't even look at me. She went to the back, talked to some doctor on the phone, and came back and said, 'We're going to give you a cane, medical shower pass, some Naproxen, and some ice.'" Tr. 2:50:01–:50:30. The Court therefore understands Grizzle as reporting a single interaction with Defendant Jane Doe #6 on September 24.

Compl. 19.   Grizzle alleges that he then began "raising hell and screaming because [he was] bleeding profusely and [was] in alot [sic] of pain."  *Id.*  At this point, Defendant McIntire entered his cell and told Grizzle he could not go to medical because he was on "restriction,"[6] but Grizzle informed him he was mistaken.  *Id.*  Grizzle then showed Defendant McIntire the cuts on his calf, to which Defendant McIntire responded that he would call medical and tell them Grizzle cut himself.  *Id.*  Defendant Nurse Kelly Brown arrived and told Grizzle to "cuff up" for his appointment.  *Id.*  Grizzle refused.  Tr. 3:21:30–:21:33.  He believed he was not on a status requiring cuffs, and he could not cuff-up behind his back because he needed to use a cane.  Compl. 19–20.  Defendant Brown asked Defendant McIntire if this was true, to which McIntire allegedly replied, "[I]t don't matter, I'm about to run the team and gas his ass!!"  *Id.* at 20 (cleaned up).  Grizzle contends that Defendant McIntire was "predisposed to use force on [him]" because they previously had "a couple run-ins."  Tr. 3:02:31–:02:37, 3:21:49–:21:56.

A few hours later, a five-man team arrived at Grizzle's cell to take him to the Montford Unit.  Compl. 20; Tr. 3:02:52–:03:05.  Grizzle believes the basis for this was Defendant McIntire "ha[ving] the nurse lie and say [Grizzle] was going to cut [himself]."  Tr. 3:02:52–:03:05.  He refused to exit his cell and began "arguing with them" because he did not want to go to Montford.  Tr. 3:06:04–:06:10.  Defendant McIntire ordered Grizzle to submit to a strip search and threatened to spray Grizzle with orthochlorobenzalmalononitrile (C.S.) gas if he did not comply.  Compl. 20; Tr. 3:06:13–:06:15.  Grizzle barricaded his cell by covering the door window with a blanket and mattress.  Tr. 3:04:35–:04:42, 3:22:13–:22:27.  According to Grizzle, he later began to comply by deconstructing the barricade and "taking [his] pants off slowly" when Defendant McIntire gassed

---

[6] Grizzle's testimony during the evidentiary hearing somewhat conflicts with his Complaint in this regard.  He testified that Defendant McIntire told Grizzle he could not attend his medical appointment because his cell door would not open.  Tr. 3:05:29–:05:33.  In either case, the Court understands Grizzle as alleging that Defendants told him he could not attend his medical appointment.

him "unprovoked." Compl. 20; Tr. 3:06:17–:06:28. Grizzle then barricaded his cell again, and Defendant McIntire had to gas him an additional two or three times to obtain compliance. Tr. 3:22:20–:22:27.

After the gassing, Defendant McIntire opened the cell door and forced Grizzle to kneel on both knees despite his injury, which Grizzle states caused something to "pop" in his knee resulting in "extreme pain." Compl. 20. Grizzle claims he informed Defendant McIntire he could not walk, but Defendant McIntire forced him to walk to the gurney, where he was transported to a high-security cell. *Id.* During transport, Defendant McIntire asked Grizzle if he was injured and Grizzle informed him about his knee, but Defendant McIntire "wrote [it] off" as "a pre-existing injury." *Id.* at 21; *accord* Tr. 3:07:23–:07:28.

Once in the high-security cell, Defendant McIntire allegedly refused to provide Grizzle "with soap to decontaminate and remove the C.S. gas from [his] body."[7] Compl. 21. This new cell did not have a working shower or light, and Grizzle was only given boxer-shorts to wear. *Id.* Grizzle contends that he "was supposedly on constant direct observation," but "no officer sat in front of [his] cell" for about six hours. *Id.*; Tr. 3:03:33–:03:48. While attempting to remove gas from his eyes in the sink, Grizzle alleges that he fell and re-injured his knee. Compl. 21. Defendant Guerra visited his cell but ignored his complaints when he showed her his injured knee and calf. *Id.* Grizzle contends he was forced to "hop around" his cell to use the restroom, causing him to fall and hit his head twice. *Id.*

Later that night, Grizzle was transferred to the Montford Unit's Crisis Management Program for "suicidal/homicidal observation." *Id.*; Tr. 3:10:54–:10:58. Grizzle maintains he "had to pop [his] own knee back into place," was still "in extreme pain," and was "burning all over from

---

[7] Other inmates gave Grizzle soap with which he was able to wash off "some of" the gas. Tr. 3:08:16–:08:33.

C.S. gas." Compl. 21. Upon his arrival at the Montford Unit, Defendant Hansen gave Grizzle a wheelchair. *Id.* But during his intake with Defendant Nurse Jane Doe #7, she ignored his complaints when he told her about his injuries and need for a walking aid and medical shower to "decontaminate" from the C.S. gas. *Id.* at 22. Grizzle testified at the *Spears* hearing that the rationale provided by Defendant for denying him a walking aid was that he could have "used it to hurt [him]self or someone else." Tr. 3:10:54–:10:58. Ultimately, Grizzle was placed in a "strip cell" where he received only "a smock," which he describes as "a thin piece of fabric thats [sic] 100% polyester." Compl. 22.

On his second day at the Montford Unit, Grizzle fell and "hit [his] face on the right side over [his] eye," which "rendered [him] unconscious." *Id.* He claims he woke up to Defendant Nurse Jane Doe #7 asking him if he wanted his medications, but she told the officer that he refused because he "spoke to her in a slur" and was "half-way unconscious." *Id.*; Tr. 3:11:52–:12:98. Defendants Hansen and Jane Doe #7 later visited his cell to check on him and Grizzle heard Defendant Hansen say, "his face is swollen, but he's breathing so f*** him." Compl. 22.

The following day Grizzle informed Defendant Hendricks that he had previously fallen and "was dizzy, naseous [sic], unsteady, vomiting, with extreme head pain." *Id.* at 23. She had the floor nurse, Defendant Nurse Jane Doe #1, examine Grizzle and take his vitals, but Doe #1 purportedly asked no questions and ignored his complaints. *Id.* Grizzle complains that Jane Doe #1 did not do a vision test, and he alleges that his vision was impacted for approximately forty-eight hours. Tr. 3:13:10–:13:51. That night, Grizzle again fell, hit his head, and lost consciousness. Compl. 23. He told this to Defendant John Doe #2 who allegedly ignored Grizzle's complaints and told him, "[Y]ea[h] right dude." *Id.*

8

On September 30, Grizzle purportedly woke up "with intense pain in [his] right knee" and "symptoms of a concussion," including a migraine headache, sensitivity to light, nausea, and vomiting. *Id.* Defendant Hendricks then took Grizzle for his first shower since being gassed, i.e., three days after the fact. *Id.* Grizzle told Defendant Hendricks that he needed medical attention but "she basically told [him] she couldn't help [him]." *Id.* Grizzle hopped on one leg to the shower and told her he had a medical shower pass, which Defendant Jane Doe #2 confirmed. *Id.* Despite this, they informed Grizzle that there were no available medical showers and told him to use "a regular shower on one foot."[8] *Id.* Grizzle then slipped and fell, hitting his knee again. *Id.* at 24. Defendant Bolla checked on Grizzle, saw his knee was dislocated, and told Grizzle to get dressed. *Id.* Defendants Hendricks and Bolla "manhandled" Grizzle out of the shower and into a wheelchair, and then brought Grizzle to medical to see Defendant Jane Doe #2. *Id.* She agreed that his injury was serious but told Grizzle that he would need to wait for his scheduled x-ray later that day. *Id.* A couple of hours later, Defendant Esquivel came to Grizzle's cell and told him to cuff up for his x-ray appointment. *Id.* When Grizzle told him that he could not walk due to his injury, Defendant Esquivel allegedly responded, "[O]h well I guess you refuse then." *Id.*

Around 5:00 pm that afternoon, another inmate on the block "flooded the room with water," which caused Grizzle's cell to fill with water that "had C.S. gas in it that came off the floors and walls from past uses . . . ." *Id.* at 25. The flooding prevented Grizzle from hopping to the toilet. *Id.* Defendants Hammond and Jane Doe #4 allowed all inmates to clean their cells save for Grizzle, citing his injury as one reason. *Id.* As a result, Grizzle claims he "was forced to defecate [and urinate] on the side of [his] bunk" for approximately forty hours. *Id.*

---

[8] At the evidentiary hearing, Grizzle clarified that Defendant Hendricks told him that the Montford Unit does not have a medical shower, but Grizzle doubts the veracity of that claim because "it's a medical unit." Tr. 2:57:50–:57:58. He conceded, however, that he did not see one there. Tr. 2:58:00–:58:02.

On October 1, Grizzle decided to pop his knee back into place, which caused him to pass out. *Id.* When it was time to shower, Defendant Baughman ignored Grizzle's complaints of pain and denied him a shower because Defendant "couldn't provide [Grizzle] with a medical shower, and he didn't want to put [Grizzle] in a regular shower and have the possibility that [Grizzle] could fall and get hurt again." *Id.* at 44; *see id.* at 26. Further, Grizzle alleges that he told every nurse and officer he saw that day "of his medical problems and the fact that [his] cell was flooded and [he] was forced to defecate on [his] floor by [his] bed." *Id.* at 26. Defendants Jane Doe #3, Evans, John Doe #3, Chavez, Longoria, and Milton all purportedly ignored his complaints. *Id.*

In the afternoon, a psychiatric provider, Defendant Hummel, visited Grizzle's block to speak with another inmate. *Id.* Grizzle then attempted to cut an artery in his right arm. *Id.* Defendant Hummel said, "I dont [sic] care," and Defendant Milton "laughed" and told him, "I hope you die." *Id.* Grizzle purportedly received no treatment for the suicide attempt, nor did anyone come to retrieve the metal he used to cut himself. *Id.* At the shift change, Grizzle told Defendants Shaffer and John Does #4 and #5 that he had cut himself. *Id.* Defendant Shaffer was concerned, so Defendants entered his cell to retrieve the metal but allegedly ignored Grizzle's requests for medical attention. *Id.*; Tr. 3:24:37–:24:48. Grizzle reports that the bleeding stopped on its own after one hour. Tr. 3:25:22–:25:28.

On October 2, Defendant Shaffer brought Grizzle breakfast, but he could not get up to retrieve it. Compl. 27. Defendant John Doe #10, the morning medicine nurse, threw Grizzle's medication in the feces on the floor and told him to "stop pulling suicide stunts." *Id.* Later that evening, Defendants Chavez, Longoria, and Milton ordered inmate orderlies to clean Grizzle's cell. *Id.* According to Grizzle, Defendants could see that he was injured but ignored his complaints. *Id.*

10

Two days later Grizzle was taken via wheelchair to see Defendant Dr. Burrescia. *Id.* Defendant Burrescia examined Grizzle's knee, asked him questions, ordered x-rays, but provided no other treatment. *Id.* He then discharged Grizzle from crisis management. *Id.* Defendant John Doe #6, however, did not immediately discharge Grizzle, allegedly causing him to spend an extra forty-eight hours in the strip cell "without toilet paper, in dirty clothes, with no bedding." *Id.* at 28, 40. Eventually, on October 6, Grizzle was transferred back to the Smith Unit. *Id.* at 28. Grizzle contends that, contrary to medical orders, he was denied a crutch or cane during the transfer, so he had to hop on one foot (without shoes) out of the Montford Unit. *Id.*

During the period between Grizzle's departure from and subsequent return to the Smith Unit, Grizzle contends that he did not have his religious material. *Id.* at 30, 42; Tr. 2:48:24–:48:36. Grizzle blames Warden Webb for failing to immediately return his property once back at the Smith Unit, which Grizzle alleges interfered with his ability to practice Catholicism for approximately one week. *Id.*; *see infra* note 23. Grizzle asserts he also lacked other non-religious materials upon his return to the Smith Unit—clean clothes for three days, toilet paper for five days, and his personal property for one week. Compl. 28; Tr. 3:29:25–30:18.

Once back at the Smith Unit, Grizzle again re-injured his knee on an unspecified date. Compl. 28. He explains that he was using the restroom when his "knee popped and hit the door frame," forcing him to "crawl around for 5 hours before medical would see [him]." *Id.* Defendants Nurse Smith and Nurse Rojas treated him. *Id.* at 29. Defendant Smith ordered Grizzle a crutch and a knee immobilizer and referred him to the emergency room for x-rays. *Id.* Defendant Rojas informed Defendant Smith, however, that there were no knee immobilizers available. *Id.* They also allegedly ignored Grizzle's complaints when he told them he "had extreme pain in [his] scrotum, a migraine headache and all that happened to [him] at Montford Unit." *Id.* According to

Grizzle, "[d]uring this entire episode the only thing medical would do for [his] pain would be to switch between ibuprofen and Naproxen, even though" neither worked. *Id.*

Grizzle's new cell at the Smith Unit did not have a medical shower. *Id.* As a result, Grizzle contends that he *again* fell and cut his knee.[9] *Id.* Grizzle also reports that, despite Defendant Smith's previous orders, he was not taken to the emergency room until after this subsequent fall.[10] *Id.* At the emergency room, Grizzle was diagnosed "with a contusion to the lower limb" and treated with one stitch. *Id.* The following day, Grizzle returned to medical and visited with Defendant Smith who ignored his "complaints of scrotum pain, headache and knee pain, and cuts to [his] legs that had gone untreated." *Id.* at 30. Grizzle "went several of the next days without getting [his] medication." *Id.*

On October 9, Grizzle alleges that Defendant Taylor prevented him from attending his medical appointment. *Id.* at 31. The same thing happened on October 14, according to Grizzle, because of Defendant Sanchez. *Id.* Similarly, Grizzle claims that between October 9 and 14 he was scheduled to meet with medical each day but was prevented from attending his appointments "by the block officers." *Id.* And according to Grizzle, between October 7 and 19, he put in sick call requests every day but was ignored. *Id.*

Grizzle alleges that his medical needs were largely ignored over the next several months.[11] *Id.* Despite this assertion, Grizzle explains that he was seen by Defendant Dr. Rose for right knee

---

[9] Grizzle names Defendant John Doe #12 as the individual responsible for placing him in a cell without a medical shower. Compl. 29.

[10] Grizzle names John Doe #13 as the person responsible for ensuring he was transferred to the emergency room for x-rays in a timely manner. Compl. 29.

[11] Specifically, Grizzle alleges that he complained about "severe scrotum pain, left heel pain, major headaches, vision problems, extreme pain in [his] [lower back], right knee, [and] rashes" and that between October 8, 2021, and February 8, 2022, he put in over 100 sick call requests and was seen about 10 times. Compl. 32, 34. Further, he states that he has "had about 30 plus medical appointments denied." *Id.* at 31. Grizzle recounts one instance where his appointment was denied, which caused him to remove the suture in his knee on his own using a razor blade. *Id.* at 32. His Complaint tells of another occasion where he "had infected sores on [his] head from dandruff psoriasis" and was simply given dandruff shampoo without an examination. *Id.* Despite this recitation of facts, Grizzle does not bring

pain on November 22. *Id.* She gave Grizzle a cane and knee brace and ordered a blood test. *Id.* He complains, however, that "she cut [the] visit short due to her having a[] conference meeting" and "she ignored [his] complaints of scrotum pain, head pain, [and] lower back pain." *Id.* Instead, Defendant Rose told Grizzle he could be seen the next day, but when he arrived, security denied him entry. *Id.* A few weeks later Defendant Rose visited Grizzle's cell and told him she would have him pulled out for an appointment, but that did not happen. *Id.*

Grizzle alleges that medical often responded to his sick call requests by "telling [him] it['] s [his] fault [he] keep[s] getting rescheduled" and that he needs "to attend all [his] appointments"; however, Grizzle maintains that security would not allow him to do so. *Id.* at 33. According to Grizzle, Defendants Parker, Webb, and Miller are "in charge of security" and "are the ones telling security not to let an inmate out if he hasn't been called out by medical whether that inmate has a lay-in appointment or not." *Id.* at 32. Further, Grizzle claims "medical puts [him] down as a no show . . . yet they know that security doesn't let us go to medical unless we are called out." *Id.* at 33. Grizzle maintains that he (1) has filed grievances that go unanswered, (2) sent requests and complaints to Defendant Collier without receiving a response, and (3) spoke with Defendants Miller, Parker, Webb, Rose, Rojas, Sanchez, Taylor, and other staff members about these issues, but nothing has been done. *Id.* at 34.

Based on the foregoing, Grizzle claims he suffers from (1) a permanent limp, (2) declining mental health "because [he] can't exercise," (3) self-mutilization due to depression, (4) extreme pain in his right knee, left heel, lower back, neck, and scrotum, in addition to migraine headaches, (5) "significant" hearing loss in his left ear, and (6) erectile dysfunction. *Id.* at 33. Grizzle seeks relief in the form of monetary damages (nominal, compensatory, and punitive), and a declaratory

---

claims for these alleged occurrences of denial of medical care. *See id.* at 1–46. Neither does he attribute this conduct to any particular party. *See id.* Accordingly, the Court does not address these allegations.

judgment "stating that each defendant violated [Grizzle's] constitutional rights, . . . A.D.A. rights[,] and Rehabilitation rights." *Id.* at 46.

### B. Any claims against Defendants Jane Doe #5, John Doe #7, John Doe #8, and John Doe #9 must be dismissed.

Grizzle's Complaint lists Jane Doe #5, John Doe #7, John Doe #8, and John Doe #9 as Defendants. *Id.* at 6–7, 12–13. He does not, however, assert a single fact that connects these Doe Defendants to the purported constitutional violations alleged either in his forty-eight-page Complaint or his *Spears* hearing testimony.

"Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). Vague and non-specific allegations of wrongdoing cannot support a constitutional claim under § 1983. *Sias v. Louisiana*, 146 F. App'x 719, 720 (5th Cir. 2005) (per curiam) (holding that vague and conclusory allegations provide an insufficient basis for § 1983 claims); *Richards v. Johnson*, 115 F. App'x 677, 678 (5th Cir. 2004) (per curiam) (same); *Lloyd v. Jones*, No. 9:18-CV-211, 2019 WL 4786874, at *6 (E.D. Tex. Sept. 10, 2019) ("The Court does not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" (quoting *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010))), *R. & R. adopted by* 2019 WL 4747850 (E.D. Tex. Sept. 27, 2019).

Here, Grizzle's allegations against Jane Doe #5, John Doe #7, John Doe #8, and John Doe #9 do not even approach vague and conclusory; they are non-existent. Accordingly, to the extent Grizzle attempts to add these Doe Defendants to the claims raised in his Complaint, any claims against them must be dismissed. *See Flowers v. Hunt Cnty.*, No. 93-1731, 1993 WL 455914, at *1 (5th Cir. Oct. 27, 1993) (affirming dismissal of claims and noting that inmate did "not allege[] sufficient facts to" show that the defendant was personally involved in any purported violations).

**C. Grizzle's § 1983 claims against the State of Texas and its instrumentality, TDCJ, must be dismissed.**

Section 1983 provides for liability against any *person* who, acting under color of law, deprives an individual of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983 (2017). Neither states nor state agencies are "persons" against whom a § 1983 claim can be asserted. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 617 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989)); *see Will*, 491 U.S. at 65–66 ("Our conclusion that a State is not a 'person' within the meaning of § 1983 is reinforced by Congress' purpose in enacting the statute."). As such, neither the State of Texas nor TDCJ are proper Defendants in this § 1983 action. Further, both are immune from claims for money damages under the Eleventh Amendment. *See Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998) ("As an instrumentality of the state, the TDCJ[] is immune from a suit for money damages under the Eleventh Amendment."); *Jennings v. Abbott*, 538 F. Supp. 3d 682, 691 (N.D. Tex. 2021) ("The State of Texas has not waived its sovereign immunity from section 1983 claims.").

Accordingly, Grizzle's § 1983 claims against the State of Texas and TDCJ must be dismissed. *See Swisher v. Tex. Workers*, Nos. 93-2388, 93-02591, 93-2655, 1994 WL 733517, at *1 (5th Cir. Dec. 30, 1994) (per curiam) (affirming district court's dismissal of the State of Texas as a defendant and noting that Texas "is not a 'person' that can be liable under § 1983"); *Caldwell v. Dall. Cnty. Sheriff*, No. 304CV2166L, 2006 WL 148734, at *1 (N.D. Tex. Jan. 19, 2006) (dismissing § 1983 claim because TDCJ "is an instrumentality of the State of Texas and is immune from suit under the Eleventh Amendment to the United States Constitution").

### D. Grizzle cannot maintain § 1983 claims against Defendant Collier in his official capacity.

Similarly, Grizzle's claims against TDCJ Director Bryan Collier in his official capacity is simply another way of stating a claim against TDCJ, and therefore the State of Texas. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State."). Moreover, state officials acting in their official capacities are not "persons" under § 1983. *See Will*, 491 U.S. at 70–71. As a result, it is well established that suits for monetary damages against state officials in their official capacities cannot succeed under § 1983. *See Almond v. Tarver*, 468 F. Supp. 2d 886, 892–95 (E.D. Tex. 2006) (collecting authorities and holding that claim against state official in his official capacity was barred by sovereign and Eleventh Amendment immunities). Thus, any § 1983 claim against Defendant Collier in his official capacity must be dismissed.

### E. Grizzle's claims alleging deliberate indifference to his serious medical needs must be dismissed.

Grizzle brings claims alleging deliberate indifference to serious medical needs against the following Defendants: Garcia, Robles, Olvera, McIntire, Brown, Guerra, Hansen, Hendricks, Bolla, Esquivel, Hammond, Baughman, Evans, Chavez, Longoria, Milton, Hummel, Shaffer, Burrescia, Rojas, Smith, Taylor, Sanchez, Rose, Jane Doe #1, Jane Doe #2, Jane Doe #3, Jane Doe #4, Jane Doe #6, Jane Doe #7, Jane Doe #8, John Doe #2, John Doe #3, John Doe #4, John Doe #5, John Doe #10, John Doe #12, and John Doe #13.[12] Compl. 12–16, 35–45. His claims in this

---

[12] As to some of these Defendants, Grizzle alleges that their deliberate indifference to his medical needs also caused him "to live in a cruel and unusual condition." *See* Compl. 12–13. To the extent Grizzle intends to bring conditions of confinement claims against those Defendants, in addition to his medical care claims, the deliberate indifference standard generally applies to both. *See Norman v. Hubert*, No. 07–387–JVP–DLD, 2009 WL 981100, at *2 (M.D. La. Mar. 18, 2009) ("Whether the treatment received by an inmate is characterized as inhumane conditions of confinement, a failure to attend to medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard . . . ."); *see also Polk v. Det. Ctr. of Natchitoches Par.*, 32 F. App'x 128 (5th Cir. 2002) (per

regard are voluminous, frequently repetitive, and at times quite difficult to decipher, even with the benefit of *Spears* hearing testimony; however, the following constitutes the Court's best effort to screen these claims after liberally construing each in Grizzle's favor.

The Constitution requires that prison officials provide adequate medical care. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate seeking to establish a constitutional violation in regard to medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991))). Deliberate indifference "is an extremely high standard to meet" (*Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (internal quotation marks and citation omitted)) and requires satisfaction of both an objective and a subjective component. *Rogers*, 709 F.3d at 410. An inmate must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). As to the subjective component, an official acts with deliberate indifference only where he (1) "knows [the] inmate[] face[s] a substantial risk of serious harm" and (2) "disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Gobert*, 463 F.3d at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (per curiam) (stating that prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

---

curiam) ("A prison official is not liable under § 1983 unless the prisoner shows that the official exhibited deliberate indifference to his conditions of confinement or serious medical needs."). The Court, however, will not examine such claims as to Defendants Jane Doe #4, Evans, Jane Doe #3, Longoria, Milton, Shaeffer, John Doe #4, or John Doe #5 because Grizzle fails to allege facts showing their purported deliberate indifference to his conditions of confinement.

An official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (alterations and internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 838). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim (*Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)), and a delay in delivering medical care creates constitutional liability only where the alleged deliberate indifference results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). In sum, an inmate must demonstrate that prison staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" to state a viable Eighth Amendment claim for deliberate indifference to serious medical needs. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

The Court examines below Grizzle's claims against each Defendant as they relate to specifically identified events; however, the Court notes at the outset that Grizzle's medical records

show he "was afforded extensive medical care by prison officials" during the relevant period, contrary to his claim that his medical needs were ignored.[13] *Norton*, 122 F.3d at 292; *see Banuelos*, 41 F.3d at 235 ("Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference."). The records establish that, between September 20 and November 22, 2021, medical personnel visited with Grizzle no less than seventeen times, prescribed him pain medication and/or antibiotics at least six times, referred him to the emergency room twice, provided him with multiple medical passes, ordered multiple x-rays, and scheduled Grizzle for an MRI. For this reason alone, many of Grizzle's claims of deliberate indifference are subject to dismissal. *See, e.g.*, *Montes v. McAdam*, No. 5:14–CV–005–C, 2014 WL 5454843, at *3 (N.D. Tex. Oct. 27, 2014) ("The type and frequency of medical care shown in the authenticated medical records . . . show that physicians have been responsive to [plaintiff's] complaints and have addressed them with medication and other forms of treatment and accommodation."); *Chavez v. Univ. Med. Ctr.*, No. 5:06-CV-157-BG, 2006 WL 8448187, at *2–3 (N.D. Tex. Dec. 22, 2006) (concluding that "authenticated medical records" "rebut [plaintiff's] claim of deliberate indifference" because they showed "that medical personnel provided him with ongoing and consistent medical care"). Similarly, the medical records often directly contradict Grizzle's claims. *See, e.g.*, Compl. 31 (claiming that between October 9–14 he was not allowed to attend medical appointments, but authenticated records show that Grizzle attended a medical appointment on October 10). Nevertheless, the Court evaluates each claim in turn.

      1. *Defendants Jane Doe #6, Jane Doe #1, Burrescia, Rose, Rojas, and Smith*

      Grizzle's claims against Defendants Jane Doe #6, Jane Doe #1, Burrescia, Rose, Rojas, and Smith all concern dissatisfaction with treatment. On September 24, 2021, Grizzle went to

---

[13] The events giving rise to Grizzle's claims occurred over a two-month span, i.e., between September 24 and November 22, 2021. *See* Compl. 18–31.

medical where he claims that Defendant Jane Doe #6 failed to examine him and instead consulted a telehealth provider. Tr. 2:50:01–:50:30. Together, they decided to prescribe Grizzle a cane, medical shower pass, ice, and a 30-day prescription for Naproxen. *Id.*; *see* Compl. 18–19. Grizzle is "not sure what else they could have done" but he believes Defendant Jane Doe #6 should have examined him and asked him "questions relevant to the injury." Tr. 2:54:23–:54:45, 2:56:33–:56:38. Concerning Defendant Jane Doe #1, Grizzle explains that she examined him and took his vitals after he reported that he had fallen. Compl. 23. He complains that Defendant Jane Doe #1 asked no questions, ignored his complaints, and did not conduct a vision test. *Id.*; Tr. 3:13:10–:13:51. As to Defendant Burrescia, Grizzle reports that he examined Grizzle's knee, asked him questions, and ordered x-rays, yet Grizzle also claims that Defendant failed to treat him because he ignored Grizzle's pain. Compl. 27, 40. Next, Grizzle alleges that Defendant Rose treated his knee pain, but ignored his "complaints of scrotum pain, head pain, [and] lower back pain."[14] *Id.* at 32. Finally, Grizzle explains that Defendants Rojas and Smith treated his knee pain but ignored his scrotum pain and headache.[15] *Id.* at 29. Further, he complains that they prescribed him a crutch and knee immobilizer, but there were no immobilizers "in stock." *Id.* at 29, 41. In other words, Grizzle admits that Defendants treated him, but he believes they should have done more.

These claims amount to dissatisfaction with the medical treatment Grizzle received, rather than the Defendants' refusal to provide treatment. *See Winston v. Stacks*, 243 F. App'x 805, 807 (5th Cir. 2007) (per curiam) ("[Prisoner's] dissatisfaction with the treatment he received is

---

[14] Medical records of the appointment show that Dr. Rose ordered a cane and knee brace. They likewise demonstrate that Dr. Rose prescribed a medical shower pass for 90 days, ordered an MRI for Grizzle's right knee, and prescribed Naproxen (500 mg) for 30 days.

[15] The medical records further show that Defendants prescribed Grizzle ibuprofen for 30 days and transferred him to the emergency room later that evening. Grizzle concedes as much. *See* Compl. 29 (stating Defendants sent him to the ER and prescribed pain medication). Between the prescription and the opportunity to discuss his various ailments with personnel at the hospital, Defendants addressed Grizzle's headache and generalized "scrotum pain," despite his belief that they should have done more. *See id.* (alleging pain medication was ineffective).

insufficient to state a constitutional claim."); *McQueen v. Karr*, No. 02-10553, 2002 WL 31688891, at *1 (5th Cir. Oct. 29, 2002) (per curiam) (affirming dismissal of prisoner's claim based on "dissatisfaction with the treatment offered him"); *Johnson v. United States*, No. 3:18cv176-TSL-RHW, 2020 WL 4496752, at *4 (S.D. Miss. June 29, 2020) ("A prisoner's dissatisfaction or disagreement with medical treatment does not establish a constitutional violation."), *R. & R. adopted by* 2020 WL 4493137 (S.D. Miss. Aug. 4, 2020); *Garrett v. Sulser*, No. 6:17cv310, 2019 WL 8500862, at *7 (E.D. Tex. Nov. 4, 2019) (concluding that complaints alleging medical personnel "merely performed a 'cursory' examination" were nothing more than "disagreement and/or dissatisfaction with the medical treatment he received"), *R. & R. adopted by* 2020 WL 562804 (E.D. Tex. Feb. 5, 2020); *Shipley v. Statton*, No. 1:08–CV–133–C ECF, 2009 WL 1469716, at *4 (N.D. Tex. May 27, 2009) ("[Plaintiff's] dissatisfaction and disagreement with the [care provided] . . . does not demonstrate that he was denied treatment.").

At best, a very liberal construction of Grizzle's allegations might state claims for negligence, which also fails to implicate the constitution. *See Gobert*, 463 F.3d at 346; *Casher v. Melton*, No. 1:14–CV–00120–C, 2015 WL 3541476, at *4 (N.D. Tex. June 2, 2015) ("Negligence or medical malpractice does not amount to a constitutional violation."); *Martikean v. United States*, No. 3:11–CV–1774–M–BH, 2012 WL 1986919, at *5 (N.D. Tex. Apr. 6, 2012) ("A failure to provide additional treatment may show medical malpractice, but it does not show deliberate indifference because decisions to provide additional treatment are matters of medical judgment."), *R. & R. adopted by* 2012 WL 1992111 (N.D. Tex. June 4, 2012).

In sum, Grizzle cannot show deliberate indifference because "it is clear that he was seen when he requested treatment and that the [medical personnel] who saw him attempted to provide several remedies for . . . a pre-existing knee condition that was aggravated by a series of accidents."

*Fails v. DeShields*, 349 F. App'x 973, 976 (5th Cir. 2009) (per curiam); *see Wiggins v. Zein*, 108 F. App'x 148, 149 (5th Cir. 2004) (per curiam) (finding no constitutional violation where inmate "received treatment for his knee injury, including pain medication, x-rays, ice packs, Ace bandages, and crutches"). For these reasons, Grizzle's claims against Defendants Jane Doe #6, Jane Doe #1, Burrescia, Rose, Rojas, and Smith fail.

### 2. *Defendants Garcia, Robles, and Olvera*

According to Grizzle, several Defendants prevented him from receiving medical care on September 27. To begin, he alleges that Defendants Garcia, Robles, and Olvera laughed at him when he showed them two "deep[,] large cuts" on his right calf and would not allow him to go to medical for treatment. Compl. 19. Grizzle's medical records indicate, however, that this injury had already been treated. On September 26, the provider cleaned the 3 cm long wound, applied sterilized strips, and wrapped his leg with gauze and medical bandages. In addition, the records show that Grizzle was already taking an antibiotic to treat infection and Naproxen for pain. Thus, to the extent Grizzle claims Defendants Garcia, Robles, and Olvera prevented him from receiving treatment for this injury, the medical records clearly refute that allegation. *See Banuelos*, 41 F.3d at 235 ("Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference."); *see also Petzold v. Rostollan*, 946 F.3d 242, 251 (5th Cir. 2019) ("Under our precedent, an official defers to prior treatment—and doesn't delay it— when he knows an injured prisoner has recently received medical care and denies the prisoner's additional treatment request for the same injury.").[16]

---

[16] The Court does not find *Davis v. Lumpkin*, 35 F.4th 958 (5th Cir. 2022) controlling here. In *Davis*, the Fifth Circuit held that a district court erred in relying on medical records to refute an inmate's claim of deliberate indifference because the two were in conflict. *Id.* at 964–65. Here, Grizzle does not contend that he was not treated on September 26, the day *prior* to Defendants' alleged conduct; he simply claims that he sought treatment for the same injury the following day. *See* Compl. 19.

Even ignoring this fact, however, Grizzle fails to state a claim. Medical records show that Grizzle met with medical personnel on September 29—two days after Defendants Garcia, Robles, and Olvera allegedly prevented him from receiving medical care. "[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference [that] *results in substantial harm*." *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (per curiam) (alterations in original) (quoting *Mendoza*, 989 F.2d at 195). Thus, "[a] delay which does not aggravate or exacerbate the plaintiff's medical complaint does not constitute a constitutional violation." *Hedges v. Hagan*, No. 2:10–CV–0101, 2011 WL 4056292, at *5 (N.D. Tex. July 20, 2011), *R. & R. adopted by* 2011 WL 4074291 (N.D. Tex. Sept. 13, 2011). Here, Grizzle does not allege that he was harmed by the delay, let alone that he was substantially harmed.[17]

### 3. *Defendants Brown and McIntire*

Grizzle also blames Defendants Brown and McIntire for allegedly preventing him from receiving medical care on September 27. Compl. 19, 35. He claims that Defendant Brown told him to cuff up for his appointment and then agreed to lie and say Grizzle "was going to cut [him]self," which caused Grizzle to be transferred to the Montford Unit. *Id.* at 19–20, 28, 35. As to Defendant McIntire, Grizzle claims Defendant likewise prevented him from attending his medical appointment and then instructed Defendant Brown to "lie and say [he] was suicidal." *Id.* at 35.

---

[17] To the extent Grizzle intends to bring a conspiracy claim against these Defendants (Compl. 35 (alleging Defendants "conspire[ed] together to prevent [Grizzle] from going to a medical appointment")), that claim similarly fails. "To establish a conspiracy claim under § 1983, the plaintiff must show that there was an agreement among the alleged co-conspirators to deprive him of his constitutional rights and that such an alleged deprivation actually occurred." *Montgomery v. Walton*, 759 F. App'x 312, 314 (5th Cir. 2019) (per curiam). "Conclusory allegations that do not reference specific factual allegations tending to show an agreement do not suffice to state a civil rights conspiracy claim under § 1983." *Id.* At no point does Grizzle allege any facts tending to show that an agreement existed between Defendants to act in concert and deprive him of his rights. *See* Compl. 35. Further, as set forth above, Grizzle has not pleaded facts showing that an actual deprivation occurred. Accordingly, any conspiracy claim is dismissed. *See Bagley v. Quada*, No. H-04-2371, 2005 WL 2757366, at *9 (S.D. Tex. Oct. 25, 2005) (concluding plaintiff's "bald allegations" that defendants conspired to violate his constitutional rights were insufficient to state a claim).

Accepting as true Grizzle's claim that Defendants Brown and McIntire are responsible for causing him to miss a scheduled medical appointment on September 27, he fails to plead facts showing that Defendants were deliberately indifferent to his medical needs. To the contrary, Grizzle's pleadings affirmatively show that Defendants did not allow him to attend the appointment because he refused to comply with orders for transfer. *See id.* at 19 (acknowledging that he refused orders to cuff up for the appointment). Despite his disagreement with the orders, Defendants' insistence on Grizzle's compliance with prison protocol does not amount to a wanton disregard for Grizzle's serious medical needs. *See Harris v. Gusman*, No. 18-7685-DMD, 2019 WL 6770021, at *5 (E.D. La. Dec. 12, 2019) ("[R]efus[al] to assist plaintiff with a non-emergency medical complaint because he had not followed the jail's procedures for requesting a medical appointment . . . is not indicative of deliberate indifference and is not actionable."); *Peavy v. Tex. Dep't of Crim. Just.*, No. G-03-279, 2006 WL 1407219, at *1–3 (S.D. Tex. May 17, 2006) (finding no constitutional violation based on inmate's allegation he missed a scheduled medical appointment where inmate "refuse[d] to load onto the bus" because he was dissatisfied with the vehicle).

Moreover, Grizzle attended a medical appointment two days later and he does not allege that any resulting delay caused him substantial harm. *See Pugh v. Green*, No. 5:18-CV-32-DCB-MTP, 2020 WL 1902269, at *3 (S.D. Miss. Jan. 27, 2020) (finding no deliberate indifference where inmate "was not taken to [a non-emergent follow-up] appointment" due to his "disruptive" behavior because inmate was seen by the doctor one week later), *R. & R. adopted by* 2020 WL 956112 (S.D. Miss. Feb. 27, 2020); *Templeton v. Pena*, No. No. 3:14–CV–1157–L, 2014 WL 2756554, at *2 (N.D. Tex. June 17, 2014) (dismissing claims at screening because plaintiff failed to allege he was substantially harmed by delay in medical care); *Fuller v. Harris Cnty.*, No. H-04-

0633, 2007 WL 1672100, at *5 (S.D. Tex. June 8, 2007) (granting summary judgment on delayed medical care claim because inmate was not "seriously harmed by missing [a post-knee-surgery follow up] appointment"), *aff'd*, 294 F. App'x 167 (5th Cir. 2008).

And to the extent Grizzle bases this claim on Defendant Brown's alleged lie, Grizzle fails to state a claim. Because Grizzle offers no facts in support of his belief that Defendant Brown lied about his suicidal thoughts or that she did so on Defendant McIntire's orders, Grizzle's allegations are too conclusory to survive screening. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[P]leadings that . . . are no more than conclusions . . . are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *Reagan v. Burns*, No. 3:16-CV-2590-G-BH, 2019 WL 6733023, at *16 (N.D. Tex. Oct. 30, 2019) (recommending dismissal of prisoner's conclusory claims as insufficient to state a claim), *R. & R. adopted by* 2019 WL 6729085 (N.D. Tex. Dec. 10, 2019).

### 4. *Defendant Guerra*

Grizzle claims that he told Defendant Guerra he needed medical attention the evening of September 27, but that she "ignored [his] complaints." Compl. 21 ("[S]he looked in my cell and I showed her my dislocated knee, and the 2 large deep cuts to my right calf."). Grizzle's allegations are insufficient for several reasons.

First, Grizzle had already received treatment for the two "cuts" and been afforded ongoing care for his knee injury. *See Petzold*, 946 F.3d at 251; *see also Sordia v. Orr*, 47 F.3d 425 (5th Cir. 1995) (per curiam) (affirming dismissal of deliberate indifference claim alleging defendants denied him medical care where inmate's "injury had already been treated"). Second, Grizzle was awaiting transport to the Montford Unit, and he fails to plead sufficient facts demonstrating that his injuries were so obviously serious that they required immediate attention prior to transfer. In other words, his allegations do not establish that Defendant Guerra was "aware of facts from which

the inference could be drawn that a substantial risk of serious harm exist[ed]" and that he actually "[drew] the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Rhine v. City of Mansfield*, 499 F. App'x 334, 335 (5th Cir. 2012) (per curiam) ("Although she alleged that she requested medical attention for her shoulder, right side, and wrist from defendants, she did not allege what she actually told defendants about the nature or extent of her injuries.").

Finally, as previously noted, Grizzle received medical attention two days later. Thus, Grizzle's claim against Defendant Guerra, at best, constitutes one for delayed care, and he does not plead any facts showing he suffered substantial harm due to the brief delay. *See, e.g.*, *Atkins v. Sheriff's Jail Avoyelles Par.*, 278 F. App'x 438, 439 (5th Cir. 2008) (per curiam) (rejecting prisoner's contention that defendant's alleged delay in sending him to a doctor constituted deliberate indifference, where prisoner had "not shown that the delay in treatment substantially harmed him or exacerbated his injury in any way").

### 5. *Defendant Jane Doe #7*

According to Grizzle, Defendant Jane Doe #7 was the intake nurse at the Montford Unit. Compl. 22. Grizzle first claims that he told Defendant that he "couldn't walk, needed a wheelchair accessible cell or a walking aid," but she told him, "That's all out the window." *Id.* The rationale provided for denying him a walking aid, Grizzle explains, was that he could have "used it to hurt [him]self or someone else." Tr. 3:10:54–:10:58. Second, Grizzle complains that Defendant Jane Doe #7 denied him his medication on one occasion. Compl. 36.

The Court first considers Grizzle's complaint that Defendant did not allow him a walking aid. The "mere failure to provide an inmate with a wheelchair [or other walking aid] does not violate the Constitution." *Hawkins v. Montague Cnty.*, No. 7:10–cv–19–O, 2012 WL 13019539, at *16 (N.D. Tex. Mar. 15, 2012). However, "[t]he failure to provide wheelchairs [or walking aids] to mobility-impaired inmates who require them can violate the Eighth Amendment if the

failure to provide poses a substantial risk of serious harm." *Coker v. Dall. Cnty. Jail*, No. 3:05–CV–005–M (BH), 2009 WL 1953038, at *30 (N.D. Tex. Feb. 25, 2009), *R. & R. adopted as modified by* 2009 WL 1953037 (N.D. Tex. July 6, 2009).

Grizzle's pleadings as to this claim are sparse. *See* Compl. 22; Tr. 3:09:54–:11:22. He states that he told Defendant he needed an ambulatory aid to walk and that he "had 2 large cuts on [his] right calf," but he pleads no facts to support an inference that Defendant knew the extent of Grizzle's *knee injury*—i.e., the basis for Grizzle's allegation that he required an ambulatory aid. *See Brewster*, 587 F.3d at 770; *Rhine*, 499 F. App'x at 335. Further, Grizzle does not contend that Defendant Jane Doe #7 had any knowledge that Grizzle had previously been prescribed such aids. *See* Compl. 22. As such, beyond the fact that he had two cuts on his leg, Grizzle provided Defendant with no basis for his belief that he needed a walking aid. A prison official's failure to follow a prisoner's self-diagnosis does not constitute deliberate indifference. *See Tijerina v. Stanley*, No. 5:16-cv-102, 2019 WL 1396964, at *5 (E.D. Tex. Mar. 28, 2019) ("The fact that medical professionals may not believe a prisoner's self-diagnosis of his medical condition does not show deliberate indifference."); *Hunt v. Barry Telford Unit, TDCJ*, No. 5:15cv152, 2017 WL 1100721, at *5 (E.D. Tex. Mar. 24, 2017) (concluding defendant "had no constitutional duty to accept [p]laintiff's self-diagnosis").

What is more, even if Defendant knew Grizzle had previously been provided with a walking aid, "[t]he refusal to provide [treatment] that was prescribed at another facility" does not, by itself, "rise to the level of deliberate indifference." *Simon v. LeBlanc*, 623 F. App'x 276, 277 (5th Cir. 2015) (per curiam). Grizzle's medical records show that Defendant completed an intake assessment of Grizzle's physical and mental condition upon his arrival at the Montford Unit. This assessment reflects that Grizzle had no difficulties with range of motion, mobility, or activities of

daily living. He also reported his pain as a 0 out of 10. Accordingly, Grizzle's claim essentially amounts to disagreement with a medical opinion, which is not actionable under § 1983. *See, e.g.*, *Holland v. Patel*, 236 F. App'x 136, 137 (5th Cir. 2007) (per curiam) ("[Prisoner's] assertion that he required a cane and that [defendant doctor] wrongfully took his away amounts to no more than a mere disagreement with the medical treatment he received or, at most, a claim for negligence and was thus properly dismissed."); *Johnson v. Talley*, 243 F. App'x 10, 11 (5th Cir. 2007) (per curiam) (explaining prisoner's contention that defendant "failed to provide him with a knee brace, cane, or walking stick . . . alleges, at most, a difference in opinion or a malpractice claim concerning [prisoner's] medical treatment and thus does not establish an Eighth Amendment violation").

As to the allegation that Defendant once "denied [Grizzle his] medication," Grizzle fails to plead facts stating a constitutional violation. *See Boykin v. Sheriff's Dep't Caddo Par.*, No. 96-31255, 1998 WL 611707, at *1 (5th Cir. Aug. 21, 1998) (affirming dismissal where prisoner alleged defendant "acted with deliberate indifference to his medical needs by refusing to provide him with his medication on one occasion"); *King v. Howard*, No. 94-40848, 1995 WL 371030, at *1 (5th Cir. June 2, 1995) (Plaintiff "occasionally . . . may not have received his prescribed medication, but these are minimal deficiencies which do not rise to the level of a constitutional violation."); *Dugas v. Quintero*, No. 2:17-CV-48, 2019 WL 7987920, at *5 (S.D. Tex. Oct. 2, 2019) (concluding that a one-time denial of medication does not amount to deliberate indifference), *R. & R. adopted by* 2020 WL 822965 (S.D. Tex. Feb. 19, 2020); *White v. MCCF*, No. 3:09CV0058–M–D, 2010 WL 1758896, at *1 (N.D. Miss. Apr. 29, 2010) ("The [p]laintiff's allegations of being denied unidentified medication on one occasion is at best negligence which is plainly insufficient to state a claim for relief.").

6. *Defendant Hansen*

Grizzle contends that Defendant Hansen was deliberately indifferent to his serious medical needs because she visited Grizzle's cell on September 28, checked that he was breathing, and left him unconscious on the floor, stating, "[H]is face is swollen, but he's breathing so f*** him." Compl. 22. Yet, Grizzle fails to plead facts demonstrating how he knows this occurred if he was, as he claims, unconscious and unresponsive. *See id.* at 36. For this reason, the Court dismisses his claim as internally inconsistent and therefore insufficient to state a plausible claim for relief. *See Eubanks v. Mullen*, No. 94-10103, 1994 WL 724986, at *1 (5th Cir. Dec. 14, 1994) (per curiam) ("While the district court may not dismiss under § 1915(d) by simply electing to credit the defendant's account of events, the district court may conclude that the plaintiff is not credible if the plaintiff's account of the events is internally inconsistent."); *Joseph v. Foti*, No. 94-30019, 1994 WL 558848, at *3–4 (5th Cir. Sept. 26, 1994) (per curiam) (affirming district court's dismissal where plaintiff's allegations were internally inconsistent); *Trevino v. City of Pleasanton*, No. 5-18-CV-00688-DAE-RBF, 2019 WL 1793360, at *5 (W.D. Tex. Apr. 23, 2019) (dismissing § 1983 complaint because the "internally inconsistent factual allegations presented" were "insufficient to state a plausible claim for relief").

7. *Defendant John Doe #2*

As to Defendant John Doe #2, Grizzle avers that on September 29, he informed this Defendant that he fell and hit his head, but Defendant responded, "[Y]ea[h] right dude." Compl. 23. Grizzle's medical records show, however, that he visited medical that very day. Thus, even assuming the veracity of Doe's purported response, Grizzle was nevertheless seen in medical that same day. And even assuming this event happened *after* his medical visit, Defendant John Doe #2 delayed Grizzle receiving medical care for, at most, five days, as Grizzle attended medical again on October 4. Beyond his general claim that he suffers migraine headaches due to the combined

effect of the purported lack of medical care, Grizzle does not allege that he was substantially harmed by this particular delay. *See Badeaux v. St. Landry Par. Sheriff's Dep't*, No. 94-40450, 1995 WL 71257, at *1 (5th Cir. Jan. 26, 1995) (per curiam) (affirming dismissal of claim where inmate was not substantially harmed by five-day delay in receiving medical care); *Cudjo v. Hammond*, No. 6:15cv1162, 2018 WL 2709442, at *7–8 (E.D. Tex. Apr. 26, 2018) (concluding pain associated with "migraine headaches," standing alone, does "not rise to the level of substantial harm"), *R. & R. adopted by* 2018 WL 2684488 (E.D. Tex. June 4, 2018); *Calton v. City of Garland*, No. 3–02–CV–2215–N, 2003 WL 21685596, at *3 (N.D. Tex. July 18, 2003) (finding no constitutional violation where plaintiff did "not allege any adverse consequences as a result of the delay in providing him medical care apart from headaches, which continue to afflict him").

Further, Grizzle's bare-bones allegations against this Defendant fail to show that Defendant John Doe #2 was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and actually "[drew] the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Guillory v. La. Dep't of Health & Hosps.*, No. 16-787-JWD-RLB, 2018 WL 1404277, at *13 (M.D. La. Mar. 20, 2018) ("[The plaintiff] alleges no facts to indicate that [the defendant] actually drew an inference that [the plaintiff] faced a substantial risk of serious harm . . . ."). For these reasons, Grizzle fails to state a constitutional claim against Defendant John Doe #2. *See Rhine*, 499 F. App'x at 335.

### 8. *Defendants Hendricks and Jane Doe #2*

Per Grizzle's Complaint, Defendants Hendricks and Jane Doe #2 instructed Grizzle to use a "regular shower" if he wanted to take a shower because there were no medical showers at the Montford Unit. Compl. 23–24. While using the "regular shower," Grizzle fell once again. *Id.* at 24. On these facts, Grizzle fails to state a constitutional claim. *See Coleman v. Layton*, No. 94-40817, 1995 WL 10521, at *2 (5th Cir. Jan. 3, 1995) (per curiam). In *Coleman*, the plaintiff was

an amputee and had been prescribed a "handicap shower pass" by medical personnel at his previous TDCJ unit; however, when he was transferred to administrative segregation in his new unit, prison staff informed him that there were "no shower facilities to accommodate his needs." *Id.* at *1. Thereafter, the plaintiff slipped and fell in the shower. *Id.* The district court determined at screening—and the Fifth Circuit agreed—that the plaintiff's allegations "at most amounted to an allegation of negligence against [d]efendants, which cannot support a claim of medical indifference." *Id.* So too here. Although Defendants Hendricks and Jane Doe #2 may have acted with negligence when they instructed Grizzle to use a regular shower at the Montford Unit, "a mere mistake in judgment is not actionable." *Id.* at 2.

### 9. *Defendants Hendricks and Bolla*

Grizzle alleges that Defendants Hendricks and Bolla were deliberately indifferent because they "manhandled" him out of the shower and into a wheelchair (for a trip to medical) after he fell and again dislocated his knee. Compl. 24. These facts fail to rise to deliberate indifference. At best they describe what had to be an incredibly difficult process, *i.e.*, two officers attempting to lift into a wheelchair an individual wet from head to toe with a dislocated knee. *See Oliva v. Rupert*, 555 F. App'x 287, 288 (5th Cir. 2014) (per curiam) (affirming dismissal of Eighth Amendment claims that transporting officers were responsible for inmate's fall while exiting van, stating "[inmate's] allegations against the two transporting officers state, at most, claims for negligence and [are] therefore not valid § 1983 claims"). Moreover, Grizzle does not ascribe anything more than *de minimis* harm due to Defendants' purported "manhandling." *See* Compl. 24 (claiming Defendants caused him pain because his injured knee hit the wall); *Sublet v. Million*, 451 F. App'x 458, 459 (5th Cir. 2011) (per curiam) (considering "temporary pain" a de minimis injury); *Herron v. Patrolman No. 1*, 111 F. App'x 710, 713 (5th Cir. 2004) (per curiam) (affirming dismissal of

claim where "the only possible claim of physical injury [was] rough handling, which resulted in a temporary increase of pain in his already injured neck," which was "at most a *de minimis* injury").

### 10. *Defendants Jane Doe #2 and Esquivel*

As to Defendants Jane Doe #2 and Esquivel, each allegedly caused Grizzle delays in medical attention. On September 30, Grizzle went to medical and spoke with Defendant Jane Doe #2, who told him that he "was already scheduled for an xray that day [and] that [he] would have to just wait." Compl. 24. When the time arrived for the appointment, however, Defendant Esquivel did not allow Grizzle to attend because Grizzle refused to submit to handcuffs. *Id.*

Grizzle concedes that he later obtained x-rays. According to authenticated medical records, those x-rays were taken on October 4—i.e., four days later. Those records likewise show that Grizzle's x-rays revealed no abnormalities. Moreover, Grizzle concedes that Esquivel attempted to escort Grizzle to the x-ray appointment, but Grizzle declined to submit to handcuffs—i.e., Grizzle was responsible for the delay. Compl. 24. As such, because Grizzle cannot demonstrate that he was substantially harmed by the delay and that Esquivel was responsible for the delay, his claims against Defendants Jane Doe #2 and Esquivel do not implicate the Constitution. *See Witt v. Bell*, 551 F. App'x 240, 241 (5th Cir. 2014) (per curiam) (observing that inmate was not substantially harmed by "the two-week delay in receiving the x-ray" and therefore affirming dismissal of prisoner's deliberate indifference claim); *Ramirez v. Stacks*, 260 F. App'x 658, 660 (5th Cir. 2007) (per curiam) (concluding prisoner failed to raise an Eighth Amendment violation where delay in diagnosis and treatment did not cause substantial harm); *Barnhill v. Loftin*, No. W-20-CA-016-ADA, 2022 WL 378443, at *5 (W.D. Tex. Feb. 8, 2022) (dismissing deliberate indifference claim because, although prisoner was treated later than he would have liked, "[p]laintiff received both a head CT and x-rays, neither of which found any substantial injury whatsoever"); *Young v. TDCJ*, No. H-18-4050, 2020 WL 825614, at *8 (S.D. Tex. Feb. 19, 2020)

(dismissing prisoner's denial of medical care claim, where prisoner did not plead facts "showing that any delay was attributable to [defendant]").

11. *Defendants Hammond and Jane Doe #4*

According to Grizzle, Defendants Hammond and Jane Doe #4 were deliberately indifferent to his serious medical needs because they allowed the other inmates to clean their cells after the floor flooded September 30,[18] but they "refused to clean [his] cell out," i.e., did not let Grizzle clean it himself due to his knee injury, and "they (Defendants) ignored [his] complaints for medical." Compl. 38. Grizzle complains that he "was forced to defecate" and urinate on the floor of his cell because he did not want to "hop" through the water to the toilet. *Id.* at 25. Liberally construed, Grizzle also potentially asserts a conditions of confinement claim as well.[19]

Grizzle pleads no facts showing that Defendants were deliberately indifferent to a serious medical need by refusing to have his cell cleaned, either by himself or someone else. Although Grizzle maintains that he told "every" nurse and officer he saw that day "of his medical problems and the fact that [his] cell was flooded" (*id.* at 26), he provides no factual assertions demonstrating that his temporary exposure to standing water containing residual CS gas presented a substantial risk of serious harm of which Defendants were subjectively aware, in relation to either his knee injury or conditions of confinement. *See Morgan v. Hendrick Med. Ctr.*, No. 1:14-CV-00117-BL, 2015 WL 13229546, at *2 (N.D. Tex. Mar. 6, 2015) ("A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" (citation omitted)); *McGiffin v. Valdez*, No. V–07–043, 2009 WL 3073939, at *5 (S.D. Tex. Sept. 18, 2009)

---

[18] Other than alleging the water contained residual "C.S. gas" that "came off the floors and walls from past uses," Grizzle claims no other purported contaminates. Compl. at 25.

[19] As previously noted, the same standard applies to both claims. *See supra* note 12.

(dismissing prisoner's claim regarding conditions of confinement where prisoner did not plead facts showing that defendants were aware of a substantial risk of harm or that the sanitation problem posed a serious threat to prisoner's health); *see also Reynolds v. Powell*, 370 F.3d 1028, 1030–31 (10th Cir. 2004) (concluding that prison's standing water problem did not rise to the level of a condition posing a substantial risk of serious harm to inmate's health or safety, despite inmate's claim that he had "a heightened risk of falling because a previous injury required [him] to use crutches"); *Stanley v. Page*, 44 F. App'x 13, 15 (7th Cir. 2002) (finding that "slow drain in the shower" resulting in standing water "did not pose 'an excessive risk' to [inmate's] health or safety"); *Tiede v. Salazar*, 518 F. Supp. 3d 955, 970 (W.D. Tex. 2021) (granting summary judgment where inmate claimed he was exposed to "sewage water" during a jail flooding and "he was not permitted to shower or provided clean clothes for a number of days after the event and was not provided medical treatment," in part because defendants did not believe the water was contaminated, and even if they did, inmate did "not allege or present evidence showing Defendants subjectively knew the contamination posed a serious medical risk to inmates if they failed to change clothing or receive medical treatment").

Interestingly, Grizzle's claim, as it relates to conditions of confinement, is more analogous to a *potential* slip-and-fall case, rather than a showing that he faced a substantial risk of serious harm—that is, he alleges there was water on the floor of his cell, and he was concerned that he might slip if he walked to the toilet. *See* Compl. 25, 38. The Fifth Circuit, however, has consistently rejected similar claims even where, unlike in this case, a fall actually occurred. *See, e.g.*, *Noble v. Grimes*, 350 F. App'x 892, 893 (5th Cir. 2009) (per curiam) (affirming dismissal of prisoner's complaint for injuries sustained as result of slip and fall due to "standing water in prison shower area" where he alleged "the defendants were aware of the dangerous conditions in the

shower area but nonetheless failed to take any preventative measures" because his "complaint, at most, allege[d] a claim of negligence"); *Atkins v. Sheriff's Jail Avoyelles Par.*, 278 F. App'x 438, 439 (5th Cir. 2008) (per curiam) (concluding inmate failed to show deliberate indifference where he claimed prison officials "failed to repair leaks that caused water puddles, which in turn caused [him] to slip and fall," and noting that "his claims amount[ed] only to claims of unreasonableness or negligence, neither of which establishes an Eighth Amendment violation"); *McLaughlin v. Farries*, 122 F. App'x 692, 693 (5th Cir. 2004) (per curiam) (finding no evidence of Eighth Amendment violation where inmate "slipped on water that had accumulated on the floor of his cell due to a leaky air conditioning unit," and "defendants were aware of the leaky air conditioning unit and negligently failed to clean up the water" because he, at most, "alleged a claim of negligence").

In addition, despite the Supreme Court's recent acknowledgement that "shockingly unsanitary cells . . . teeming with human waste" can render the length of exposure to such conditions a secondary consideration (*see Taylor v. Riojas*, 141 S. Ct. 52, 54 n.2 (2020)), the general principle remains that under less severe circumstances "the length of time spent in the offensive conditions should be taken into account." *Alexander v. Tippah Cnty.*, 351 F.3d 626, 631 (5th Cir. 2003) (per curiam); *see Hutto v. Finney*, 437 U.S. 678, 686–87 (1978) ("A filthy, overcrowded cell . . . might be tolerable for a few days and intolerably cruel for weeks or months."); *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (finding no Eighth Amendment violation where inmate was kept in filthy cell for only three days and was given cleaning supplies). Here, Grizzle alleges less than a two-day exposure (forty hours) to water containing only residual CS gas. *See Lamb v. Howe*, 677 F. App'x 204, 209 (6th Cir. 2017) (concluding four hours of exposure to allegedly unsanitary water in prisoner's flooded cell was merely "a temporary inconvenience"); *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001) (rejecting

constitutional claim where inmate "was subjected to a flooded cell" and "deprived of a working toilet" because he "alleged only temporary inconvenience and did not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities").

Moreover, Grizzle cannot recover compensatory damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury," which he has not shown here. *See* 42 U.S.C. § 1997e(e). First, Grizzle's only potentially identifiable harm is his general assertion that the "cuts on [his] leg" became "infected." Compl. 38. Without more, this purported harm constitutes nothing more than de minimis injury and provides insufficient basis for an actionable § 1983 claim. *See Kennedy v. Dall. Police Dep't*, No. 3:06-CV-0716-G, 2007 WL 30260, at *4 (N.D. Tex. Jan. 4, 2007) (concluding tooth infection that caused "pain and discomfort" was a de minimis injury); *Cranford v. Compton*, No. 1:04cv783-LG-JMR, 2006 WL 2805348, at *7 (S.D. Miss. Sept. 5, 2006) (finding inmate's "infected scalp [to be] insufficient to establish a 'physical injury'"); *Ervin v. Hill*, No. 3-05-CV-1651-K, 2005 WL 3742791, at *3 (N.D. Tex. Nov. 10, 2005) (determining that "conclusory assertions" that inmate needed treatment "for cuts, rashes, cold and flu-like symptoms, infection, and migraine headaches" because he was exposed to "a staph-infected environment" were "insufficient to establish 'physical injury' under the PLRA"). Second, as discussed above, Grizzle had already been prescribed an antibiotic to *prevent* such an infection on September 26 (*supra* section II.E.2), and medical records confirm that Grizzle had subsequent medical appointments on October 4, 6, and 7, in addition to a hospital visit on October 6. Detailed treatment notes from the hospital visit show no subjective complaint or objective evidence of infection. To the contrary, the nurse observed that the "scab [was] in place, [with] no drainage/bleeding noted." Thus, despite Grizzle's insufficient conclusory allegation that he suffered an infection, he has alleged no facts demonstrating a compensable

physical injury. *See Boyce v. Harris Cnty. Jail*, No. H-20-2971, 2020 WL 7024665, at *2 (S.D. Tex. Nov. 30, 2020) (dismissing condition of confinement claim where inmate's cell was flooded with toilet water for nine days because he did "not identify any physical injury")

Finally, and most notably, any feces and urine that appeared on Grizzle's cell floor were by his choice—he alleges no facts showing that he asked for and was denied assistance to use the toilet. *See* Compl. 25; *compare Taylor v. Williams*, No. 5:14-CV-149-BG, 2016 WL 8674566, at *3–5 (N.D. Tex. Jan. 22, 2016) (finding inmate pleaded sufficient facts to survive motion to dismiss as to claim that "he was subjected to filthy conditions in the cell, including fecal matter on the floor, ceiling, walls, and water facet"), *R. & R. adopted by* 2016 WL 1271054 (N.D. Tex. Mar. 29, 2016); *with Eckard v. Walters*, No. C19-000242 RAJ, 2019 WL 6650504, at *2 (W.D. Wash. Dec. 6, 2019) (dismissing claim that inmate was "'forced' to urinate on the floor" because he did not allege "that he informed corrections staff that he needed to use the toilet and was denied") and *Schmitt v. United States*, No. 3:17CV117-TSL-RHW, 2018 WL 4102517, at *3–4 (S.D. Miss. Aug. 6, 2018) (finding no constitutional violation based on inmate's allegation that "plumbing issues resulted in the [prison] flooding and raw sewage entering inmates' cells," and observing that there was "no allegation that prison officials created the hazardous condition"), *R. & R. adopted by* 2018 WL 4100950 (S.D. Miss. Aug. 28, 2018). Such conditions, standing alone, similarly fail to satisfy the required injury element. *See Alexander*, 351 F.3d at 631 (concluding nausea caused by "the smell of the raw sewage covering the floor of the . . . cell" was a *de minims* injury precluding monetary damages under the Prison Litigation Reform Act).

In sum, Grizzle has pleaded insufficient facts demonstrating that the temporary flooding of his cell caused conditions of confinement that presented a substantial risk of serious harm of which Defendants were subjectively aware. Further, these allegations similarly fail to satisfy

constitutional muster concerning his medical condition, i.e., cuts and knee injury, as he has failed to plead any specific facts showing that these Defendants were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and actually "[drew] the inference." *Brewster*, 587 F.3d at 770; *see Rhine*, 499 F. App'x at 335; *Armstrong v. Hodges*, Civil Action No. H–11–1611, 2011 WL 5156796, at *2 (S.D. Tex. Oct. 27, 2011) (dismissing medical claim where plaintiff failed to plead facts which would "permit a finding that [defendant]" could infer a substantial risk of harm and "actually drew an inference"). For these reasons, Grizzle has not established that Defendants were deliberately indifferent to the standing water in his flooded cell.

12. *Defendants Evans, Chavez, Longoria, Jane Doe #3, John Doe #3, Baughman, John Doe #10, and Milton*

Grizzle contends that he told "every nurse and officer" he saw on October 1 of his "medical problems." Compl. 26. Namely, he identifies Defendants Jane Doe #3, Evans, John Doe #3, Chavez, Longoria, and Milton as ignoring his complaints. *Id.* at 26, 39. On that same day, Grizzle states that he told Defendant Baughman about his injuries, but Defendant Baughman ignored him. *Id.* at 26, 38. Similarly, Grizzle theorizes that Defendants Chavez, Longoria, and Milton "could clearly see" that he was injured on October 2, but they "ignored [his] complaints for medical attention." *Id.* at 27. Finally, Grizzle contends that John Doe #10 similarly ignored his complaints after Grizzle informed him about "all [his] medical problems." *Id.*

Grizzle provides no particularized facts he claims to have communicated to these Defendants concerning his condition—he simply pleads that he told of his "medical problems" and that Defendants "could clearly see" he needed help. These vague allegations are so devoid of specifics that the Court cannot make the required finding that Defendants were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]"

and actually "[drew] the inference." *Brewster*, 587 F.3d at 770. The claims therefore cannot proceed.[20] *See Rhine*, 499 F. App'x at 335; *Robinson v. Meeks*, No. 3:17-CV-606-K, 2018 WL 1399478, at *14 (N.D. Tex. Mar. 20, 2018) ("Plaintiff alleges no facts to support these conclusory allegations of [defendant's] deliberate indifference and subjective intent to cause [p]laintiff harm. Merely stating the elements of a claim in a conclusory fashion is not enough to sufficiently allege a claim."). What is more, beyond his conclusory assertion that Defendants Baughman and John Doe #10 caused him "further harm" and "prolonged [his] pain and suffering," Grizzle does not attribute any physical harm to Defendants' actions. *See* Compl. 38–39. Such a deficiency is again fatal to his claims. *See* 42 U.S.C. § 1997e(e); *see also Vega v. Hill*, No. 3-05-CV-1577-L, 2005 WL 3147862, at *3 (N.D. Tex. Oct. 14, 2005) ("[C]onclusory assertions are insufficient to establish 'physical injury' under the PLRA."); *Bargalla v. Valdez*, No. 3-05-CV-0593-M, 2005 WL 1163304, at *2 (N.D. Tex. May 13, 2005) ("Plaintiff claims only that he suffered 'unnecessary pain and suffering,'" which "is insufficient to establish 'physical injury' under the PLRA.").

13. *Defendants Hummel, Milton, Shaffer, John Doe #4, and John Doe #5*

Grizzle brings claims against Defendants Hummel, Milton, Shaffer, John Doe #4, and John Doe #5 for their purported failure to provide medical care after he cut himself on the arm. Compl.

---

[20] The Court acknowledges that Grizzle's allegations against Defendant Baughman are more detailed than his claims against the other defendants. Namely, Grizzle contends that he told Baughman that his "leg had been dislocated, [he] was in extreme pain, [and] that [he] had a concussion." Compl. 26. Per Grizzle's pleadings, however, he had "popped his knee back into place" the night before, meaning that he reported a prior, rather than an ongoing, injury. *Id.* at 25 (cleaned up). As for his alleged concussion, Grizzle's medical records show no evidence of a concussion. *See Sanford v. Tarrant Cnty. Sheriff's Dep't*, 628 F. App'x 301, 302 (5th Cir. 2016) (per curiam) (affirming dismissal of deliberate indifference claim at screening, observing that there was "no evidence in the medical records that [inmate] suffered a concussion"). Indeed, wellness-check notes from October 1 and 3 show that Grizzle "denied needs and voiced no complaints" and "[was] in no acute distress with no medical complaints," respectively. Grizzle also had medical appointments on October 4 and 6 in which he received prescriptions for Divalproex (which, among other things, prevents migraine headaches) and Ibuprofen. Thus, at most, Grizzle reported a prior injury, pain, and a suspected concussion, and he received medical care three and five days later. As such, even assuming his allegations were not so vague, Grizzle attributes no harm to the brief delay in medical care, which defeats any claim of deliberate indifference against Defendant Baughman. *See Turner v. Dickerson*, No. 2:18-CV-219-Z-BR, 2022 WL 484912, at *3 (N.D. Tex. Feb. 16, 2022) (dismissing inmate's claims that he "lost consciousness, fell, . . . injured himself[,]" and defendants delayed treatment, where inmate made "no allegation of significant injury").

26–27, 39.  Medical records reflect that the injury was a "superficial laceration" for which "no treatment [was] required."  More significantly, Grizzle's own description of the injury establishes that it was a minor wound.  *See* Tr. 3:25:22–:25:28 (stating that it stopped bleeding on its own after one hour).  Accordingly, accepting his claims as true, Grizzle has not demonstrated that he was suffering from a serious medical need.  *Lockett v. Suardini*, 526 F.3d 866, 877 (6th Cir. 2008) (explaining that "minor lacerations and cuts" were not serious medical needs); *Davis v. Jones*, 936 F.2d 971, 972–73 (7th Cir. 1991) ("No reasonable person would believe that a one-inch cut presents [a serious medical need] unless the injured person is a hemophiliac."); *Solis v. Gatson*, No. W-13-CV-375, 2016 WL 9686992, at *9 (W.D. Tex. June 22, 2016) (concluding "two cracked ribs, a small laceration over his eye, and bruises on his shoulder and knee" were not serious medical needs).

### 14. *Defendant John Doe #10*

As to Defendant John Doe #10, Grizzle alleges that he "threw [Grizzle's] medication in the feces on [the] floor and told [him] to stop pulling suicide stunts."  Compl. 27.  The Court understands Grizzle as alleging that Defendant's actions caused him to miss a single dose of medication.  While such conduct would clearly be repugnant and juvenile, it and its consequences would not rise to the level of actionable deliberate indifference.  *See King*, 58 F.3d at 636; *White*, 2010 WL 1758896, at *1; *Boutte v. Bowers*, 3:01–CV–1084–G, 2001 WL 1041761, at *3 (N.D. Tex. Aug. 30, 2001) ("Plaintiff's allegation that [the defendant] refused to give him his . . . medication on one occasion does not approach the threshold of deliberate indifference under the Eighth Amendment.").  Further, verbal abuse does not violate the Constitution.  *See Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993); *Bell v. Norwood*, No. 7:08-CV-069-0, 2008 WL 11449416, at *2 (N.D. Tex. Aug. 4, 2008), *aff'd*, 325 F. App'x 306 (5th Cir. 2009).

15. *Defendant John Doe #12*

Grizzle alleges that, upon his return to the Smith Unit, he "was placed in a cell that had no medical shower even though [he] was required one by medical." Compl. 29. He attributes this to Defendant John Doe #12 and claims that it was a violation of the Eighth Amendment because Defendant was deliberately indifferent to his serious medical needs. *Id.* at 29, 41. As a result, Grizzle allegedly fell and cut his knee in the shower.[21] *Id.* at 29. This claim is similarly unavailing.

Grizzle provides no facts sufficient to infer that Defendant knew of Grizzle's prior injuries or that Grizzle had previously been prescribed a shower pass. *See Serton v. Sollie*, No. 02-61010, 2003 WL 22849840, at *4 (5th Cir. Dec. 2, 2003) ("[Prisoner] contends that he had a medical prescription for the cane prior to his incarceration and that he told the jail medical staff of this fact on his arrival at the jail. This fact, if true, does not show that Sheriff . . . and Jail Administrator . . . were subjectively aware of this fact or that they acted with deliberate indifference to [prisoner's] need for a cane."). Because of this lack of knowledge, Defendant John Doe #12 is, at best, guilty of negligence, which does not give rise to a § 1983 claim. *See Coleman*, 44 F.3d at 1005 ("[Coleman's] allegations regarding Defendants' actions prior to his slip and fall accident at most demonstrate negligence, but a mere mistake in judgment is not actionable."). Accordingly, on these facts, Grizzle does not state a claim for deliberate indifference against Defendant John Doe #12.

16. *Defendant John Doe #13*

Grizzle takes issue with the length of time he had to wait to obtain x-rays. He alleges that Defendants Smith and Rojas ordered x-rays, but that Defendant John Doe #13 failed to "mak[e]

---

[21] Beyond stating that the fall occurred on October 6, Grizzle does not specify how long he was housed in this cell. Compl. 29. The Court observes, however, that Grizzle describes this cell assignment in the past tense, and he identifies only a single slip and fall while housed in the cell. *See id.* Accordingly, the Court understands Grizzle to allege that he is no longer housed in a cell without a medical shower.

sure [he] was transferred to the E.R. for x-rays in a timely manner." Compl. 29. According to authenticated records, Grizzle obtained x-rays on October 4, 2021—i.e., the same day they were ordered. Thus, at most, the delay of which he complains was a matter of hours. Because Grizzle pleads no facts suggesting he was substantially harmed by this delay, this claim is without merit. *See Witt*, 551 F. App'x at 241; *Carrera v. Hunt*, No. 6:08–CV–0032–BI ECF, 2008 WL 5973782, at *5 (N.D. Tex. Oct. 20, 2008) (dismissing claim at screening where plaintiff failed to demonstrate substantial harm due to delay in obtaining x-rays), *R. & R. adopted by* 2009 WL 1066304 (N.D. Tex. Apr. 21, 2009).

### 17. *Defendants Taylor and Sanchez*

Grizzle claims Defendants Taylor and Sanchez prevented him from attending medical appointments on October 9 and 14, respectively. Compl. 31. The Court notes, however, that Grizzle does not allege facts specifying *why* Defendants Taylor and Sanchez allegedly prevented him from keeping his appointments or, more significantly, that in doing so they acted with deliberate indifference. *See Thomas v. Carter*, 593 F. App'x 338, 344 (5th Cir. 2014) (per curiam) (concluding that negligent failure to schedule medical appointment does not amount to deliberate indifference); *Scott v. Stiefer*, No. 6:20cv479, 2021 WL 2008810, at *4 (E.D. Tex. Apr. 15, 2021) (observing that plaintiff did not allege defendants acted intentionally and noting that "[t]he mere fact of a delay does not establish that anyone had the 'culpable state of mind' necessary to state a claim for deliberate indifference" (citation omitted)), *R. & R. adopted by* 2021 WL 1998796 (E.D. Tex. May 19, 2021); *Miller v. City of E. Mountain*, No. 2:17-cv-00496-JRG-RSP, 2019 WL 2288117, at *3 (E.D. Tex. Feb. 6, 2019) ("Plaintiff provides a few conclusory statements that the jailers acted with deliberate indifference to [his] serious medical needs, but he does not provide any well-pleaded facts to show a subjective intent to cause harm."); *see also Sampia*, 2010 WL 6600163, at *6; *Richardson*, 2008 WL 2385919, at *2. Specifically, Grizzle alleges no facts

42

showing that Defendants were subjectively aware of his need for medical care and consciously ignored it. *See Rhine*, 499 F. App'x at 335; *Butler v. Munoz*, No. 7:01-CV-172-R, 2002 WL 32319050, at *2 (N.D. Tex. Oct. 29, 2002) (observing that plaintiff "present[ed] nothing more than conclusory allegations regarding the involvement of" defendants, and plaintiff therefore "failed to articulate facts which, if taken as true, would demonstrate that any of these defendants were deliberately indifferent to his need for medical care").

Moreover, Grizzle's medical records show that he attended medical appointments on October 10 (i.e., one day after the missed October 9 appointment) and November 1 (i.e., approximately two weeks after the missed October 14 appointment). Grizzle does not ascribe any harm—let alone *substantial* harm—to these delays. *See* Compl. 31. For this additional reason, these claims must be dismissed. *See Atkins*, 278 F. App'x at 439; *Easter*, 467 F.3d at 464; *see also McGiffin v. Clayton*, No. 08-40213, 2009 WL 577721, at *1 (5th Cir. Mar. 6, 2009) (unpublished) (affirming dismissal for failure to state a claim where inmate did not allege that he was substantially harmed by "a lengthy delay" in care).

### 18. *Defendant Jane Doe #8*

In Grizzle's final deliberate indifference claim, he contends that Defendant Jane Doe #8 violated his Eighth Amendment rights by failing to permit him access to his medical records. Compl. 43. Beyond citing the Eighth Amendment, Grizzle has not provided support for his belief that he possesses a constitutional right to access his medical records while incarcerated, and the Court has found none. *See Ramirez v. Delcore*, 267 F. App'x 335, 336 (5th Cir. 2008) (per curiam) (dismissing appeal of district court's rejection of prisoner's § 1983 due process claim concerning lack of access to medical records); *Martinez v. Livingston*, No. 6:13cv802, 2014 WL 7877166, at *5 (E.D. Tex. Dec. 29, 2014) ("There is no constitutional right to inspect or challenge one's medical records."), *R. & R. adopted by* 2015 WL 661293 (E.D. Tex. Feb. 13, 2015); *Mejia v.*

*Bureau of Prisons*, No. C-05-543, 2006 WL 1030004, at *1 (S.D. Tex. Apr. 19, 2006) ("A prisoner

has no constitutional right of access on demand to his medical records to search them for a possible

medical malpractice claim."); *Mendoza v. Moron*, No. M-05-184, 2006 WL 491940, at *5 (S.D.

Tex. Feb. 28, 2006) ("There is no constitutional right for a patient to see his medical records.").

This claim, therefore, cannot proceed.

### F. Grizzle has not pleaded sufficient facts demonstrating that Defendant Webb violated his First Amendment rights.

Grizzle claims that for approximately three weeks he was deprived of his religious material,

which in turn interfered with his ability to practice Catholicism.  Compl. 30, 42; Tr. 2:48:24–

:48:36.  Grizzle explains that prison staff at the Smith Unit confiscated his personal property

(dishonestly claiming Grizzle was suicidal) before he was temporarily transferred to Montford,

and when they returned his property his rosary, Catholic Bible, and religious books were missing.[22]

Tr. 2:46:21–:48:01.  The prison chaplain replaced Grizzle's missing rosary and Bible, but Grizzle's

religious books were apparently never recovered.  Tr. 2:47:21–:48:36.  He attributes this alleged

First Amendment violation to Defendant Webb because, according to Grizzle, he "informed

---

[22] Grizzle does not raise a general claim of property deprivation against Defendant Webb.  To the extent he intends to bring one against Defendant McIntire based on McIntire's supposed confiscation *in violation* of existing state policies (*see* Compl. 3 ("Bryson McIntire . . . took property without due process pursuant to state policies"), 45 (claiming several defendants "failed to follow" state policies resulting in "an independent violation of [Grizzle's] due process rights")), such claim fails because he has an adequate state remedy under Texas law. *See, e.g., Jenkins v. Livingston*, 388 F. App'x 417, 419 (5th Cir. 2010) (per curiam) ("Because Texas provides an adequate state postdeprivation remedy, the district court did not err in dismissing [prisoner's] claim of property loss resulting from any deficiency in the defendants' response to [other inmate's] conduct.").  To the extent, however, Grizzle intends to bring a claim against Defendant McIntire based on McIntire's supposed confiscation *pursuant to or consistent with* existing state policies, those allegations could state a claim if Grizzle had pleaded adequate facts in support. *See Washington v. Collier*, 747 F. App'x 221, 222–23 (5th Cir. 2018) (per curiam) (rejecting inmate's argument that his deprivation claim was not barred given that the taking was done "pursuant to an established state policy or procedure" because inmate "identified no such established policy or procedure at work").  The Court therefore dismisses the former with prejudice because he could plead no facts to overcome the deficiency, and the latter without prejudice because he could possibly cure the deficiency through an amended pleading.  Nevertheless, the Court does not give Grizzle the opportunity to do so in this action because Grizzle has already filed suit based on the same set of facts in another action. *See Grizzle v. Robles*, No. 5:22-CV-132-BQ, at ECF No. 1 (N.D. Tex. July 5, 2022).

[Webb] in person that [his] religious items were being held out of [his] possession," but Defendant Webb "basically told [him he would] just have to wait." Compl. 30, 42.

A prisoner's First Amendment rights are violated when he "possess[es] a sincere religious belief" and is not afforded "reasonable opportunity" to exercise those beliefs. *DeMarco v. Davis*, 914 F.3d 383, 388 (5th Cir. 2019); *Davis v. Davis*, 826 F.3d 258, 265 (5th Cir. 2016) (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam)); *accord Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004) (explaining that "[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith" (citation omitted)). On the other hand, "[a]n isolated incident or *de minimis* limitation that temporarily inhibits a prisoner's exercise of religion is not of constitutional dimension." *Pagonis v. Raines*, No. 4:17-CV-01-DC-DF, 2018 WL 9240919, at *3 (W.D. Tex. Aug. 10, 2018) (citing *Walsh v. La. High School Athletic Ass'n*, 616 F.2d 152, 158 (5th Cir. 1980), *cert. denied*, 449 U.S. 1124 (1981)), *R. & R. adopted by* 2018 WL 9240916 (W.D. Tex. Sept. 10, 2018).

Despite the temporary deprivation of his Bible and Catholic rosary, Grizzle's allegations do not implicate the Constitution. First, Grizzle identifies only a single occurrence of limited duration (approximately one week)—isolated incidents are generally considered *de minimis*.[23] *See Morgan v. Patterson*, 772 F. App'x 117, 119 (5th Cir. 2019) (per curiam) ("[Prisoner] alleged only isolated incidents resulting in the denial of kosher meals, which are insufficient to state a First Amendment claim."); *Thompson v. Quarterman*, No. V-01-01, 2007 WL 2900564, at *2 (S.D.

---

[23] Grizzle claims he was without his property for approximately three weeks. Compl. 30, 42; Tr. 2:48:24–:48:36. The Court notes, however, that this three-week period includes Grizzle's time at the Montford Unit, during which he was not under Defendant Webb's supervision. *See* Compl. 21 (explaining he was transferred to the Montford Unit the evening of Sept. 27, 2021, when the deprivation allegedly began), 28 ("On wed oct 6th I was transferred back to the smith unit via van."), 30 (stating he received his "property on or about 10-13-21"). Based on Grizzle's own allegations, he spent about one week without his property while at the Smith Unit.

Tex. Sept. 30, 2007) ("An isolated denial, such as having to miss a single religious service, does not constitute a substantial burden on a prisoner's right to practice his religion."); *Castillo v. Blanco*, No. 07-215, 2007 WL 2264285, *12 (E.D. La. Aug. 1, 2007) (finding that requiring an inmate to work on one occasion on a Saturday, which the inmate observes as the Sabbath, was a *de minimis* burden on the free exercise clause and not of constitutional dimension). Further, beyond conclusory and vague claims, Grizzle does not contend that he was unable to practice his religion in any identifiable way. *See* Compl. 42 (alleging he was "prevent[ed] . . . from practicing [his] religion" but providing no explanation or facts in support). Thus, even assuming Grizzle's unspecified religious books were never returned to him, Grizzle has not pleaded sufficient facts to support a viable claim. *See Newby v. Pate*, No. 2:06-CV-0127, 2007 WL 2791455, at *9 (N.D. Tex. Sept. 4, 2007) (dismissing at screening First Amendment claim where inmate's religious materials were confiscated for fifty-four days because he did "not indicate any way in which his ability to practice his religion was compromised"). For these reasons, his pleadings are insufficient to state a First Amendment violation.[24]

---

[24] Grizzle also alleges that Defendant Webb "was deliberately indifferent to [his] serious medical needs" and "failed to take action after [Grizzle] informed him that [Grizzle] was being forced to live in inhumane conditions." Compl. 14. Despite this assertion while listing the "parties to the suit," Grizzle's only allegations in the "Statement of Claim" section concern the purported property deprivation. *See id.* at 30. And at the evidentiary hearing, Grizzle only specified that he told Defendant Webb about past occurrences and Grizzle's ongoing lack of "religious materials, . . . clean clothes, shoes, . . . [and] a cane." Tr. 3:32:30–:33:10. As to the allegations concerning clean clothes, these facts do not rise to constitutional violations. *See infra* section II.G.1. The same is true of Grizzle's temporary lack of shoes, particularly where he ascribes no harm. *See Taylor v. Serna*, No. 5:19-CV-239-M-BQ, 2020 WL 930836, at *2 (N.D. Tex. Jan. 30, 2020) (finding no constitutional violation where inmate "was made to go to school in [his] bare feet," given that he failed to identify "any actual harm to his health or safety due to his lack of shoes, much less harm exceeding a *de minimis* level"), *R. & R, adopted by* 2020 WL 918786 (N.D. Tex. Feb. 26, 2020). Next, although Grizzle may have preferred a cane, he acknowledges that Defendants Rojas and Smith prescribed him a crutch. *See* Compl. 29. According to medical records, this happened on October 6 and Grizzle alleges that he complained to Defendant Webb about needing a cane on October 7. Tr. 3:32:30–:32:34. But Grizzle's desire for a cane as opposed to a crutch does not establish that any Defendant—let alone non-medical personnel Warden Webb—was deliberately indifferent to his needs. *See Mercer v. United States*, 508 F. App'x 324, 325 (5th Cir. 2013) (per curiam) (noting that an inmate's disagreement with a "doctor's choice of treatment . . . does not support a constitutional violation").

To the extent Grizzle brings any other claims against Defendant Webb for deliberate indifference, those claims are devoid of factual support and therefore must be dismissed. *See Van Cleave v. United States*, 854 F.2d 82, 84 (5th Cir. 1988) (per curiam) (requiring specific facts and noting that conclusory allegations are insufficient to maintain a claim under 42 U.S.C. § 1983); *Travis Blank v. United States*, No. 4:14-CV-502-O, 2016 WL 54369, at *5 (N.D. Tex. Jan.

**G. The conditions of confinement claims must be dismissed.**

Grizzle brings conditions of confinement claims against John Doe Defendants #1, #6, and #11. Compl. 40–41. While the Constitution does not mandate comfortable prisons, it does require humane ones, and the Eighth Amendment governs the conditions under which inmates are confined. *Reagan*, 2019 WL 6733023, at *13 (quoting *Wilson v. Lynaugh*, 878 F.2d 846, 849 (5th Cir. 1989)); *see Talib*, 138 F.3d at 215 ("[T]he Constitution does not mandate prisons with comfortable surroundings or commodious conditions."). The Eighth Amendment does not protect prisoners from those conditions that cause "discomfort or inconvenience." *Wilson*, 878 F.2d at 849. Indeed, the Fifth Circuit, following the Seventh Circuit's lead, has noted that "[i]nmates cannot expect the amenities, conveniences and services of a good hotel . . . ." *Id.* at 849 n.5 (quoting *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988)).

Moreover, only those officials who know of and disregard "an excessive risk to inmate health or safety" are liable under the Eighth Amendment for denying inmates humane conditions of confinement. *Farmer*, 511 U.S. at 837.

> A constitutional violation . . . occurs only when two requirements are met. First, there is an objective requirement that the condition must be so serious as to deprive prisoners of the minimal civilized measure of life's necessities, as when it denies the prisoner some basic human need. Second, under a subjective standard, we must determine whether the prison official responsible was deliberately indifferent to inmate health or safety.

*Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (per curiam) (internal citations and quotation marks omitted).

Finally, a prisoner in a conditions of confinement case "must demonstrate not only that he was exposed to a substantial risk of serious harm, but that he actually suffered some harm that was

---

5, 2016) (dismissing conclusory deliberate indifference claim); *see also Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.").

more than *de minimis*." *Reagan*, 2019 WL 6733023, at \*13 (citing *Alexander*, 351 F.3d at 630–31); *see also Mayes v. Travis State Jail*, No. 07-51086, 2008 WL 4657078, at \*1 (5th Cir. Oct. 22, 2008) ("A prisoner seeking to recover damages on a conditions of confinement claim must establish a physical injury that is more than de minimis.").

### 1. John Doe #11

Grizzle claims Defendant John Doe #11 is responsible for denying Grizzle "basic human necessities such as change of clothes, toothbrush, toothpaste, toilet paper, shoes, [and] soap" when Grizzle returned to the Smith Unit. Compl. 28, 41. Grizzle reports that he lacked clean clothes for three days, toilet paper for five days, and his personal property for one week. Tr. 3:29:25–:30:18. This claim must be dismissed because Grizzle has not demonstrated that these conditions deprived him "of the minimal civilized measure of life's necessities." *Woods*, 51 F.3d at 581; *see Garcia v. Currie*, 674 F. App'x 432, 433 (5th Cir. 2017) (per curiam) (finding no Eighth Amendment violation where prisoner "was clothed only in a paper gown in a cold, bare cell and was not given soap, daily showers, or free access to running water or toilet paper"); *Ruiz v. LeBlanc*, 643 F. App'x 358, 361 (5th Cir. 2016) (per curiam) ("[T]he lack of a clean change of clothing every day is not sufficient to state a viable Eighth Amendment claim."); *Byrd v. Adams*, 389 F. App'x 411, 412 (5th Cir. 2010) (per curiam) (affirming screening dismissal of complaint alleging prisoner suffered hemorrhoids and peeling skin as result of prison policy restricting high security inmates to one roll of toilet paper per week); *Thornton v. Merchant*, No. H–10–0616, 2011 WL 147929, at \*12 (S.D. Tex. Jan. 18, 2011) (dismissing as frivolous Eighth Amendment claim concerning inmate's loss of personal property); *Jones v. McCoy*, No. 2:09–CV–0203, 2010 WL 2473842, at \*1 (N.D. Tex. June 17, 2010) ("A single instance of the deprivation of toilet paper, as a matter of law, does not constitute cruel and unusual punishment warranting Eighth Amendment

relief."); *Hernandez v. City of Farmers Branch*, No. 3:01–CV–1184–G, 2002 WL 66162, at *4 (N.D. Tex. Jan. 10, 2002) (concluding six days without hygiene items, shower, and sufficient food was a "a temporary inconvenience" and "not the type of extreme deprivation that amounts to punishment").

In addition, Grizzle concedes that he was not harmed by the denial, except that he was briefly "dirty and unclean." Tr. 3:30:42–:30:53. For this additional reason, the Court must dismiss Grizzle's claim. *See* 42 U.S.C. § 1997e(e); *see also Vega v. Hill*, No. 3-05-CV-1577-L, 2005 WL 3147862, at *3 (N.D. Tex. Oct. 14, 2005) (concluding inmate did not establish requisite "physical injury" based on allegations that he was exposed "to mold, mildew, dead bugs, dirty showers, and spoiled food"); *Crawford v. Caddo Corr. Ctr.*, No. 5:14–cv–3198, 2015 WL 3622689, at *2–3 (W.D. La. June 9, 2015) (rejecting Eighth Amendment claim based on the "inconvenience" of dirty laundry because inmate did not suffer more than de minimis harm).

   *2. John Doe #6*

Grizzle seeks to hold Defendant John Doe #6 responsible for failing to immediately discharge him from the Montford Crisis Management Unit, which then caused Grizzle to spend an extra forty-eight hours in the strip cell. Compl. 28, 40. According to Grizzle, in that cell he was forced to live "without toilet paper, in dirty clothes, with no bedding." *Id.* at 40. Grizzle largely takes issue with the fact that Defendant did not act more quickly, thus requiring him to remain in the cell "without reason after [he had] been discharged from crisis management." *Id.* Accordingly, the Court understands Grizzle as bringing a claim concerning this delay.

"[A]n inmate has no constitutionally protected right to be housed at the unit of his choice." *Walker v. Bradshaw*, No. 2:09–CV–0243, 2010 WL 2697168, at *1 (N.D. Tex. July 8, 2010); *see, e.g., Olim v. Wakinekona*, 461 U.S. 238, 244–45 (1983); *Meachum v. Fano*, 427 U.S. 215, 225

(1976); *Yates v. Stalder*, 217 F.3d 332, 334 (5th Cir. 2000) (per curiam); *Tighe v. Wall*, 100 F.3d 41, 42 (5th Cir. 1996) (per curiam). And even in the realm of release from confinement, offenders are not entitled to immediate release because "it is reasonable for jailers to have some administrative delay in processing an inmate's discharge." *Crittindon v. LeBlanc*, 37 F.4th 177, 188 (5th Cir. 2022). Certainly, then, Grizzle cannot succeed on a claim based on the brief delay in his transfer from the one TDCJ unit to another.

To the extent Grizzle likewise challenges the conditions of his confinement during that forty-eight-hour period, Grizzle has not pleaded facts demonstrating a constitutional violation. *See Young v. McCain*, 760 F. App'x 251, 257 (5th Cir. 2019) (per curiam) (finding no Eighth Amendment violation where prisoner "complain[ed] that he was sentenced to 'strip cell/isolation,' that he was deprived of a mattress, sheets, and blankets for 60 days, and that" during the fall and winter, "he was given only 'a very very light fabric material,' two undershirts, and two pairs of socks, and was not provided with a mattress and bedding between 5:30 a.m. and 8:30 p.m. each day"); *James v. LeBlanc*, No. 09–cv–1592, 2011 WL 6842516, at *6–7 (W.D. La. Nov. 16, 2011) (finding no Eighth Amendment violation where inmate, wearing only paper gown, was confined for twenty-four hours in a "strip cell" with a concrete bunk and no toilet paper, soap, or toothbrush), *R. & R. adopted by* 2011 WL 6842512 (W.D. La. Dec. 29, 2011).

### 3. *John Doe #1*

During the eight and a half days he spent in crisis management at the Montford Unit, Grizzle received only the one smock to use as clothing and bedding. Compl. 27. Grizzle sues John Doe #1—the unknown personal responsible for "caus[ing] [him] to live in inhumane conditions" by providing inmates with smocks without instituting a policy for how often the smocks would be changed out. *Id.* at 3, 28. Other than the provision of only one smock and the

denial of any other clothing or bedding, however, Grizzle asserts no further alleged violation. These living conditions while under suicide watch in the crisis management unit are not unconstitutional. *See Currie*, 674 F. App'x at 433 (finding no Eighth Amendment violation where prisoner "was clothed only in a paper gown in a cold, bare cell" as part of facility's effort to "curtail[] . . . influx of illicit drugs"); *Morgan v. Barnett*, No. 7:09–CV–167–O, 2012 WL 1033507, at *3–4 (N.D. Tex. Mar. 22, 2012) (finding no constitutional violation based on prisoner's claim that he was not given clothing while in a suicide prevention cell), *R. & R. adopted by* 2012 WL 1193741 (N.D. Tex. Apr. 10, 2012); *Morris v. Winn Corr. Ctr.*, No. 08-CV-1488, 2009 WL 2391844, at *2 (W.D. La. Aug. 4, 2009) (dismissing claim at screening based on inmate's allegations that his "clothes were taken away and he was placed in a cell in [segregation] for five days.").[25] The Court therefore dismisses this claim.

### H. Grizzle cannot maintain due process claims against Defendants for their alleged failure to follow TDCJ rules.

Grizzle raises due process claims against Defendants Miller, Parker, Webb, Collier, Luna, Lozada, Ramirez, Reed, Ybarra, and Sessions based upon their alleged "fail[ure] to follow their own polic[ies], rules, regulations and procedures." Compl. 45. Yet he provides no factual support explaining what Defendants did or did not do, nor does he state which purported policies Defendants violated. *See id.* Thus, there is no factual basis upon which the Court can evaluate these allegations. *See Reed v. Quarterman*, 129 F.3d 610 (5th Cir. 1997) (per curiam) (dismissing appeal because inmate "provided no factual basis to support" his claim "that prison officials violated his procedural due process rights"). "[Fifth Circuit] case law is clear . . . that a prison

---

[25] For the same reason, Grizzle's policy claim based on the same facts fares no better. Grizzle cannot maintain a cognizable claim based on an allegedly unconstitutional policy without first proving an underlying constitutional violation. *See, e.g., Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2011). Accordingly, the Court dismisses this claim. *See Self v. City of Mansfield*, 369 F. Supp. 3d 684, 702 (N.D. Tex. 2019) (dismissing policy claim in part because plaintiff failed to state an underlying constitutional violation).

official's failure to follow the prison's own policies, procedures or regulations does not constitute a violation of due process, if constitutional minima are nevertheless met." *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (per curiam); *accord Brown v. Felts*, 128 F. App'x 345, 346 (5th Cir. 2005) (per curiam) (dismissing appeal as frivolous where inmate argued "prison officials violated their own policies and procedures for placing him in administrative detention," and citing *Myers* in support).  Without more, Grizzle's pleadings fail to demonstrate that Defendants' actions were anything less than constitutionally sufficient.  *See Welsh v. Lamb Cnty.*, No. 5:20-CV-077-BQ, 2020 WL 12919919, at \*9 (N.D. Tex. Dec. 16, 2020) (recommending dismissal of due process claim where plaintiff "plead[ed] no facts to establish that [the procedures] were anything but adequate"), *R. & R. adopted by* 2022 WL 209282 (N.D. Tex. Jan. 24, 2022).  As such, this claim must be dismissed.  *See, e.g.*, *Keys v. United States*, No. 3:17-CV-2940-N-BH, 2020 WL 2753143, at \*7 (N.D. Tex. Apr. 20, 2020) (recommending dismissal of claim as frivolous because a prison official's "failure to follow prison rules and regulations does not give rise to a constitutional violation"), *R. & R. adopted by* 2020 WL 2745604 (N.D. Tex. May 27, 2020).

**I.   Grizzle's § 1983 supervisory liability claims fail.**

Grizzle contends that several Defendants are responsible for allegedly unconstitutional policies, which in turn violated his constitutional right to receive adequate medical care.  Compl. 42–43.  As to this allegation, he names Defendants Webb, Miller, Parker, and Rose.  *Id.*  Further, Grizzle asserts failure to train and/or supervise claims against Defendants Miller and Parker.  *Id.* at 16.

*a.   Policy claims*

It is well established that supervisory officials are not liable for the acts of their subordinates unless: (1) they affirmatively participated in an act that caused a constitutional

deprivation, or (2) they implemented an unconstitutional policy that resulted in injury to the plaintiff. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citing *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)). A prisoner must sufficiently allege facts showing either personal involvement or implementation of an unconstitutional policy to make a supervisor responsible under § 1983, as prison supervisors "are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins*, 828 F.2d at 303. A plaintiff can prove "a government's policy or custom" through methods other than reference to formal policy, such as showing the existence of an unconstitutional practice that is so "persistent and widespread" as to constitute a de facto policy or custom. *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690–91, 694 (1978). Plaintiffs face a high burden when claiming a level of pervasiveness sufficient to attribute an informal policy to a government entity or supervisory official. *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984) ("Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy."). Further, even if a plaintiff can prove implementation of a policy, supervisory liability only exists if "the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Thompkins*, 828 F.2d at 304 (internal quotation marks omitted) (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir. 1985)).[26]

First, the Court notes that Grizzle has not stated a viable deliberate indifference § 1983 claim against any Defendant. He therefore cannot state a claim for supervisory liability. *See*

_____

[26] The Fifth Circuit "has noted 'the close relationship between the elements of municipal liability and an individual supervisor's liability' and held that 'the same standards of fault and causation should govern.'" *Walker v. Upshaw*, 515 F. App'x 334, 339 n.19 (5th Cir. 2013) (per curiam) (quoting *Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 551 (5th Cir. 1997)). For this reason, cases evaluating the policy elements for one will often cite cases construing the other. *See, e.g.*, *Thompkins*, 828 F.2d at 304 (supervisory liability) ("Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" (quoting *Grandstaff*, 767 F.2d at 169, 170 (municipal liability))). This Court follows a similar track and relies on authority involving both municipal and supervisory liability in analyzing Grizzle's claims.

*Mouille*, 977 F.2d at 929; *Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013) ("All of [appellant's] inadequate supervision, failure to train, and policy, practice, or custom claims fail without an underlying constitutional violation."); *Gibbs v. King*, 779 F.2d 1040, 1046 n.6 (5th Cir. 1986) ("There is no supervisory liability without primary liability."); *Taylor v. Hale*, No. 3:07-CV-1634-L, 2008 WL 4449502, at *8 (N.D. Tex. Sept. 30, 2008) ("[E]ven if [p]laintiff were to adequately set forth an unconstitutional policy or custom, his claim fails as a matter of law because the court has found that there is no underlying constitutional violation."); *Campbell v. Harris*, No. 3:96CV3220L, 2000 WL 349746, at *8 (N.D. Tex. Mar. 31, 2000) ("When there is no underlying constitutional violation, the policy becomes irrelevant and is 'quite beside the point.'" (quoting *Los Angeles v. Heller*, 475 U.S 796, 799 (1986)), *aff'd*, 31 F. App'x 152 (5th Cir. 2001). For this reason alone, Grizzle claims against Defendants Webb, Miller, Parker, Rose, and John Doe #1 must be dismissed.

Further, Grizzle does not explain the basis for his claim that TDCJ's policies result in inadequate medical care. *See* Compl. 42–43. Rather, Grizzle appears to allege a widespread "custom" without providing supporting facts, such as specifically identifying even one other inmate who was similarly denied adequate medical care. *See id.* Most importantly, Grizzle does not identify affirmative acts by Defendants Webb, Miller, Parker, or Rose that resulted in such a policy or custom. *See id.* Rather, Grizzle has simply named every person with a title that he thinks *might* have some policymaking role and claims that they should be held liable. Thus, Grizzle does not plead facts sufficient to survive screening concerning a policy or custom within TDCJ related to medical treatment. *See Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) ("The description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts."); *Schaefer v. Whitted*, 121 F.

Supp. 3d 701, 718 (W.D. Tex. 2015) ("Plaintiff's allegations are simply a reformulation of the elements of a claim for municipal liability based on an unconstitutional custom or practice devoid of any factual enhancement or support."). "Without specifically identifying policies promulgated by [TDCJ] policymakers, and without providing specific examples of persistent and widespread abuse, [Grizzle] fails to provide the [Defendants] with fair notice of the grounds for [his] claim." *Schaefer*, 121 F. Supp. 3d at 719.

Accordingly, the Court dismisses Grizzle's policy claims against Defendants Webb, Miller, Parker, and Rose.

> ### b.  *Failure to train and/or supervise*

"Even within the difficult world of *Monell* liability, failure-to-train claims are especially difficult to establish." *Anderson v. Marshall Cnty.*, 637 F. App'x 127, 134 (5th Cir. 2016) (per curiam) (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). A defendant's "failure to train" employees only gives rise to liability where the failure "evidences a deliberate indifference" to the plaintiff's constitutional rights such that it can "be properly thought of as a . . . policy or custom that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (internal quotation marks omitted). Grizzle does plead any facts showing *how* Defendants' training was deficient. "Vague assertions regarding the need for 'better or more training' [are] insufficient for a constitutional failure to train claim." *Backe v. City of Galveston*, 2 F. Supp. 3d 988, 1007 (S.D. Tex. 2014) (quoting *City of Canton*, 489 U.S. at 391). Grizzle has therefore failed to sufficiently plead the first element of a failure-to-train claim. *See, e.g.*, *Gallaher v. City of Maypearl*, No. 3:17-CV-1400-M, 2018 WL 700252, at *6 (N.D. Tex. Feb. 2, 2018) (dismissing plaintiff's failure to train claim in part because plaintiff did "not point to a specific training program or identify what training or supervision should have occurred to prevent the allegedly unconstitutional actions of"

defendants); *Gaynier v. Hudson*, No. 3:16-CV-2314-D-BK, 2017 WL 6626347, at *3 (N.D. Tex. Nov. 16, 2017) ("Absent factual enhancement, Plaintiff's allegations amount to little more than a claim that the City generally failed to train its police force, which is legally inadequate.").

In addition, Grizzle pleads no facts showing that Defendants' alleged inadequate training was the moving force behind his injuries, which is also fatal to his claim. *See Hatcher ex rel. T.H. v. Nueces Cnty.*, No. 2:17–CV–155, 2017 WL 2985639, at *3 (S.D. Tex. July 13, 2017) ("[Plaintiff] . . . does not provide any facts that would allow this Court to plausibly infer from these pleadings that Nueces County failed to adequately train deputies on the ADA and that such failure resulted in serious injury . . . ."); *Moon v. City of El Paso*, No. SA–06–CA–925–OG, 2016 WL 9777021, at *7 (W.D. Tex. Oct. 31, 2016) ("Plaintiff has not shown a direct link (or *any* link) between inadequate training . . . and a deprivation of [his] constitutional rights."), *aff'd*, 906 F.3d 352 (5th Cir. 2018); *Woods v. Chapman*, No. 44:04–CV–405–Y, 2006 WL 560714, at *2 (N.D. Tex. Mar. 7, 2006) (dismissing claim at screening because plaintiff did "not allege[] any causal link between any failure to train or supervise any of the respective parole division employees, and the alleged violations of his rights"), *aff'd*, 239 F. App'x 35 (5th Cir. 2007).

Thus, the conclusory allegations in Grizzle's Complaint, as supplemented by his *Spears* testimony, are insufficient to establish supervisory liability based on Defendants Miller and Parker's purported failure to train and/or supervise their subordinates. *See Rivera v. Salazar*, 166 F. App'x 704, 706 (5th Cir. 2005) (per curiam) (affirming dismissal at screening of conclusory policy claims). The Court therefore dismisses Grizzle's claims against these Defendants.[27]

---

[27] Grizzle's claims against these Defendants remain uncertain even after considering his *Spears* hearing testimony, i.e., whether he seeks to impose vicarious liability, direct liability, or both. For example, Grizzle claims to have personally told these Defendants about the alleged violations of their subordinates. *See* Tr. 3:33:10–:34:30; *see also* Compl. 31, 34, 42. And in his Complaint, Grizzle mixes his claims against these Defendants (Assistant Wardens of the Smith Unit), with those against Defendant Webb—i.e., the Smith Unit Warden. *See id.* Thus, to the extent Grizzle intends to bring direct liability claims against Defendants Miller and Parker (as he did with their superior, Defendant Webb), those claims are subject to dismissal for the same reasons provided as to Defendant Webb. *See supra* note 24.

**J. Grizzle's ADA/RA claims for compensatory damages and declaratory relief against TDCJ and the State of Texas survive preliminary screening; his ADA/RA claims for other relief and against the remaining Defendants, however, must be dismissed.**

Grizzle avers that Defendants Jane Doe #2, John Doe #12, Hendricks, Baughman, Esquivel, Luna, Lozada, Ramirez, Reed, Ybarra, Sessions, Webb, Miller, Parker, Collier, TDCJ, and the State of Texas violated his rights under the ADA and RA. Compl. 37, 41, 43–45.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a *prima facie* claim under the ADA, a plaintiff must show the following:

> (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Epley v. Gonzalez*, 860 F. App'x 310, 312 (5th Cir. 2021) (per curiam) (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)). "In addition to their respective prohibitions of disability-based discrimination, both the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005); *see Buchanan v. Harris*, No. 20-20408, 2021 WL 4514694, at *2 (5th Cir. Oct. 1, 2021) (quoting *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020)) ("The ADA requires public entities, including jails and prisons, to make 'reasonable accommodations for disabled individuals.'"). For a failure to accommodate claim, a plaintiff must prove that "(1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596

n.9 (5th Cir. 2015). It is unclear whether Grizzle relies on a discrimination or a failure-to-accommodate theory. *See* Compl. 43 (stating Defendants failed to accommodate him), 44 ("I was also denied services . . . solely because of my disability.").

The RA similarly provides that a disabled individual shall not "solely by reason of her or his disability . . . be denied the benefits of . . . any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a claim for relief under the RA, a plaintiff must allege the following: "(1) the existence of a program or activity within the state which receives federal financial assistance; (2) the plaintiff is an intended beneficiary of the federal assistance; and (3) the plaintiff is a qualified handicapped person, who solely by the reason of her handicap has" either "been denied benefits from, or otherwise been subject to discrimination under[,] such program or activity." *Hay v. Thaler*, 470 F. App'x 411, 417–18 (5th Cir. 2012) (per curiam) (quoting *Melton*, 391 F.3d at 676 n.8).

The Fifth Circuit has recognized that "[j]urisprudence interpreting either [the ADA or RA] is applicable to both." *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). This is because "the rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely duplicative of those provided under § 504 of the Rehabilitation Act." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). The causation requirements for the ADA and RA, however, differ in that the RA proscribes discrimination "solely by reason of" disability, where the ADA states that "discrimination need not be the sole reason" for the discrimination. *Id.* Under either statute, a plaintiff must show intentional discrimination to recover compensatory damages. *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002).

Grizzle does not specify why he considers himself disabled. Based on his pleadings, however, the Court liberally construes his claim as asserting that his knee injury qualifies as a

disability under the ADA/RA.  Compl. 43 ("I am an American with a physical and mental impairment that substantially limits a major life activity, such as showering . . . ."), 44 (stating that he was excluded from services " . . . because of [his] disability I.E. inability to walk" and that his "disability" prevented him from "ambulat[ing]").  For screening purposes, the Court will assume Grizzle's knee injury constitutes a qualifying disability.  *See* 42 U.S.C. § 12102(4)(A) ("The definition of disability . . . shall be construed in favor of broad coverage of individuals . . . ."); *Epley*, 860 F. App'x at 312–13 (explaining that "[w]hether a plaintiff is disabled under the ADA is not a demanding question" and requires only that the Court ask if the plaintiff has a physical impairment that "substantially limits" at least one major life activity such as walking, lifting, or bending (quoting § 12102(2)).

Grizzle maintains that Defendants discriminated against him in the following ways: (1) requiring him to shower in a regular shower despite his medical shower pass; (2) failing to provide him a cell with a disability accessible shower; (3) excluding him from showering on one or more occasion(s); and (4) preventing him from attending medical appointments.  Compl. 37, 41, 43–45.  Grizzle further alleges that Defendants did so with knowledge of his need for accommodations and/or the prior medical orders requiring Defendants to accommodate that need. *See id.* at 37, 41, 43–45.  In other words, Grizzle's pleadings satisfy the elements for the discrimination test—i.e., qualifying disability, denial of services, by reason of disability—as well as the failure-to-accommodate test—i.e., qualifying disability, notice, and failure to reasonably accommodate. *See Epley*, 860 F. App'x at 312; *Ball*, 792 F.3d at 596 n.9.

Thus, at this stage of the proceedings, Grizzle's allegations, taken as true, sufficiently state ADA/RA violations against TDCJ and the State of Texas. *See, e.g.*, *Douthit v. Collier*, No. 20-20550, 2022 WL 5240152, at *2 (5th Cir. Oct. 5, 2022) (concluding inmate sufficiently pleaded a

viable cause of action where his allegations "met the three elements required for an ADA failure-to-accommodate claim"); *Epley*, 860 F. App'x at 314 (holding prisoner stated facts sufficient to survive screening on his ADA claim, where prisoner alleged "that, even though his single-cell restriction had never been formally revoked, the Montford officials disregarded that restriction" despite knowing "of that restriction" and it being "documented in his medical records"); *Schorsch v. Kwarteng*, No. 2:19-CV-323, 2021 WL 5242983, at *4 (S.D. Tex. Jan. 7, 2021) (denying prison's motion to dismiss prisoner's ADA claim, where prisoner's allegations "suggest[ed] that prison officials originally provided [p]laintiff with a special housing accommodation . . . based on his physical limitations caused by his qualifying disability" but violated the accommodation and then unlawfully removed it), *R. & R. adopted by* 2021 WL 4129566 (S.D. Tex. Sept. 10, 2021); *Douthit v. Dean*, No. H–12–2345, 2012 WL 4765793, at *4–5 (S.D. Tex. Oct. 8, 2012) (ordering defendant to answer prisoner's ADA claim based on defendant's alleged denial of reasonable accommodations for his disability); *see also Cadena*, 946 F.3d at 726 (reversing district court's grant of summary judgment to defendant where evidence showed that defendant refused to provide inmate with a wheelchair due to a lack of space, despite the inmate being booked into jail in a wheelchair and defendant observing that she could not walk with crutches and had to be transported to medical in a wheelchair).

That said, Grizzle's claims against Defendants Jane Doe #2, John Doe #12, Hendricks, Baughman, Esquivel, Luna, Lozada, Ramirez, Reed, Ybarra, Sessions, Webb, Parker, Miller, and Collier in their individual capacities must be dismissed. As noted above, Title II of the ADA applies to public entities—individual state employees do not qualify as public entities. *See* 42 U.S.C. § 12131(1) (defining "public entity" as "any State or local government," and "any . . . instrumentality of a State or States or local government"); *see also Smith v. Hood*, 900 F.3d 180,

184 n.6 (5th Cir. 2018) (noting that "the ADA cannot be assessed against an individual"); *Lollar v. Baker*, 196 F.3d 603, 609–10 (5th Cir. 1999) (holding that a plaintiff cannot sue a defendant individually under the RA); *Payne v. Sperry*, No. 1:18-CV-0027-BL, 2019 WL 1932213, at *6 (N.D. Tex. May 1, 2019) (dismissing claims as frivolous because "neither [the ADA or RA] provides for relief against any individual"); *Coker v. Dall. Cnty. Jail*, No. 3:05–CV–005–M (BH), 2009 WL 1953038, at *16 n.11 (N.D. Tex. Feb. 25, 2009) ("[T]he ADA and Rehabilitation Acts only provide for relief against public entities, which do not include individual defendants."), *R. & R. adopted as modified by* 2009 WL 1953037 (N.D. Tex. July 6, 2009); *Meredith v. Nowak*, No. 06-2384, 2008 WL 4808905, at *4 (E.D. La. Oct. 31, 2008) ("Title II of the ADA which is applicable to a 'public entity' does not include individuals.").

Further, Grizzle's ADA and RA claims against Defendants Jane Doe #2, John Doe #12, Hendricks, Baughman, Esquivel, Luna, Lozada, Ramirez, Reed, Ybarra, Sessions, Webb, Parker, Miller, and Collier in their official capacities should similarly be dismissed.[28] An ADA suit against

---

[28] The Fifth Circuit has recognized that an ADA/RA suit seeking prospective relief may be brought under *Ex parte Young* against individual defendants in their official capacities. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) ("Under *Ex parte Young*, a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law." (internal quotation marks omitted)). As such, any claims for prospective relief against these Defendants would survive screening; however, Grizzle's request for declaratory relief in this action is not properly characterized as *prospective*—rather, he "asks the Court to issue a declaratory statement . . . that each defendant violated his constitutional rights . . . and . . . his A.D.A. rights and Rehabilitation rights . . . ." Compl. 46. For this reason, Grizzle's Complaint cannot be said to fall within the *Ex parte Young* exception. *See Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) ("In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." (cleaned up)); *Texas Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 507 (5th Cir. 2021) ("This court applies a three-factor test to determine whether a suit falls within the *Ex Parte Young* exception to Eleventh Amendment sovereign immunity. Such a suit must: (1) be brought against state officers acting in their official capacities; (2) seek prospective relief that will redress ongoing conduct; and (3) allege a violation of federal law."), *cert. denied*, 142 S. Ct. 2852 (2022). The Court therefore dismisses all ADA/RA claims for relief against these Defendants in their official capacities. *See Rhoades v. Martinez*, 560 F. Supp. 3d 1039, 1046 (S.D. Tex. 2021) (granting motion to dismiss because plaintiff's "request for declaratory relief [was] retroactive in nature" and therefore did not fall under *Ex parte Young*), *aff'd*, No. 21-70007, 2021 WL 4434711 (5th Cir. Sept. 27, 2021); *Collins v. Garcia*, No. 3:18-CV-3299-N-BH, 2020 WL 4296376, at *4 (N.D. Tex. May 12, 2020) (dismissing at preliminary screening because the *Ex parte Young* exception did not apply to plaintiff's claim seeking "retrospective declaratory relief"), *R. & R. adopted by* 2020 WL 4284580 (N.D. Tex. July 27, 2020).

a state official in his or her official capacity is not a suit against the official but rather a claim against the official's office. *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 420 n.5 (5th Cir. 2017); *see Phillips ex rel. J.H. v. Prator*, No. 20-30110, 2021 WL 3376524, at *2 (5th Cir. Aug. 3, 2021) ("As a defendant she named Sheriff Prator in his official capacity, which means this is a suit against the Sheriff's Office."). Because Grizzle brings suit against TDCJ, any claims against the individual Defendants in their official capacities are duplicative of those against the entity itself. *See Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 262 (5th Cir. 1999) ("[A] party may not maintain a suit against both an employer and its agent under Title VII."); *Sims v. Jefferson Downs Racing Ass'n, Inc.*, 778 F.2d 1068, 1081 (5th Cir. 1985) ("The district court's entry of judgment against *both* the corporation and [defendant] in her official capacity [in this § 1983 action] would therefore effectively make the corporation liable twice for the same act."). Therefore, Grizzle cannot bring ADA/RA claims against both TDCJ and Defendants in their official capacities. *See Rojas v. City of Grand Prairie*, No. 3:18-CV-1776-K, 2019 WL 1115052, at *6 (N.D. Tex. Mar. 11, 2019) ("[Plaintiff] cannot bring an ADA action against [defendant] in [defendant's] official capacity because [plaintiff] is suing the City on the same facts."); *Harville v. Texas A & M Univ.*, 833 F. Supp. 2d 645, 659 n.8 (S.D. Tex. 2011) (dismissing RA claims against defendants in their official capacities because "those claims duplicate [plaintiff's] claims against [the entity]"); *Shabazz v. Tex. Youth Comm'n*, 300 F. Supp. 2d 467, 474 (N.D. Tex. 2003) (referencing *Indest*) ("The Fifth Circuit's rationale for prohibiting concurrent suits under Title VII against an employer and the employer's agent in her official capacity is equally applicable under the ADA.").

Finally, to the extent Grizzle seeks punitive damages for his ADA/RA claims, he cannot obtain relief. *See Barnes v. Gorman*, 536 U.S. 181, 189 (2002) (holding that "punitive damages

may not be awarded in private suits brought under . . . § 202 of the ADA and § 504 of the

Rehabilitation Act"); *Lee v. Dallas Cnty.*, No. 3:19-CV-02690-L, 2021 WL 5505652, at *6 (N.D.

Tex. Nov. 24, 2021) (citing *Barnes*).  The Court therefore dismisses Grizzle's ADA/RA claims for

punitive damages.  The Court will require TDCJ and the State of Texas to file an answer, motion,

or other responsive pleading regarding Grizzle's ADA/RA claims for compensatory damages.[29]

### K.  Grizzle's excessive force claim against Defendant McIntire survives preliminary screening.

To establish a constitutional violation for excessive use of force by a prison official, a

plaintiff must show that the defendant unnecessarily and wantonly inflicted pain.  *See Whitley v.*

*Albers*, 475 U.S. 312, 319–21 (1986).  Whether an official's use of force is unnecessary or wanton

depends on if the "force was applied in a good faith effort to maintain or restore discipline or

maliciously and sadistically for the very purpose of causing harm."  *Hudson v. McMillian*, 503

U.S. 1, 6 (1992) (quoting *Whitley*, 475 U.S. at 320–21).  Factors relevant to this determination

include, but are not limited to, the following: (1) the extent of the prisoner's injury; (2) "the need

for application of force"; (3) "the relationship between that need and the amount of force used";

(4) "the threat reasonably perceived by the responsible" officers; and (5) any efforts officers made

to temper the severity of a forceful response.  *See id.* at 7 (internal quotation marks omitted);

*accord Baldwin v. Stalder*, 137 F.3d 836, 839 (5th Cir. 1998).

Grizzle brings an excessive use of force claim against Defendant McIntire based on the

September 27, 2021, incident, which began with Grizzle becoming agitated after McIntire told him

to "cuff up" for a medical appointment.  Compl. 35.  As noted above, Defendant McIntire

eventually ordered Grizzle to submit to a strip-search because of Grizzle's purported suicidal

---

[29] The Court acknowledges that Grizzle can only recover compensatory damages upon a showing of intentional discrimination. *See Smith v. Harris Cnty.*, 956 F.3d 311, 318 (5th Cir. 2020). The Court makes no finding at this time as to whether Grizzle has made this showing.

statements and impending transfer to Montford.[30] *Id.* at 20; Tr. 3:02:52–:03:05. Grizzle admits

that he refused to exit his cell and began "arguing with them" because he did not want to go to

Montford. Tr. 3:06:04–:06:10. Defendant McIntire threatened to spray Grizzle with C.S. gas if

he did not comply with the strip search. Compl. 20; Tr. 3:06:13–:06:15. Rather than complying,

Grizzle barricaded his cell by covering the door window with a blanket and mattress. Tr. 3:04:35–

:04:42, 3:22:13–:22:27. Grizzle claims that after a while he subsequently began to comply by

deconstructing the barricade and "taking [his] pants off slowly" when Defendant McIntire gassed

him "unprovoked." Compl. 20; Tr. 3:06:17–:06:28. Grizzle then barricaded his cell again, and

Defendant McIntire had to gas him two or three more times to get him to submit. Tr. 3:22:20–

:22:27.

      TDCJ provided video footage of the use of force incident. The video begins with a direct

view of Grizzle's cell door, which has a small window. Grizzle yells into the window and at times

holds up a blanket to cover the opening. The officer provides a warning to Grizzle, telling him

that gas will be administered if he does not comply with orders. In response to the officer's

question, Grizzle says he is ready to comply. Two officers approach the door, and Grizzle can be

heard yelling, "I can't, I'm on a cane . . . I'm injured!" The officers walk away. Grizzle then

states, "I'm taking my clothes off. I'm not refusing." A moment passes, during which the officers

and Grizzle communicate inaudibly. One of the officers then sprays Grizzle with gas through the

window. According to the time stamp on the video, the burst of spray lasts between 1.5–2 seconds.

Grizzle then holds his mattress and blanket against the door. After a few minutes, a five-man team

---

[30] Prior to the strip search order, Defendants ordered Grizzle to cuff-up and he refused. Compl. 19–20. At the evidentiary hearing, Grizzle clarified that the cuff-up order was no longer active because Defendants had already initiated Grizzle's transfer to the Montford Unit. Tr. 3:02:39–:03:30. As such, the Court understands Grizzle as alleging that the only order relevant to the use of force incident is Defendant McIntire's instructions for Grizzle to submit to a strip search.

lines up outside Grizzle's cell. Grizzle inaudibly communicates with the officers. An officer then administers a second spray of gas. Several more minutes go by, during which Grizzle and the officers communicate off and on through the door. Eventually, the officers open the cell door, Grizzle kneels, officers cuff and lift him onto a gurney, and Grizzle is transported to a high security cell. The following exchange then takes place:

| | |
|---|---|
| Officer: | "Do you have any injuries from the use of force?" |
| Grizzle: | "Yes." |
| Officer: | "What are they?" |
| Grizzle: | "My knee." |
| Officer: | "The knee? That's a previous injury. Do you have any injuries from the chemical agent?" |
| Grizzle: | "Yes, I'm burning all over." |
| Officer: | "That's part of the chemical agent. Do you have any other injuries?" |
| Grizzle: | "Yes, my eyes." |
| Officer: | "That's part of the chemical agent. Do you have any other injuries? |
| Grizzle: | "Can I decontaminate, please?" |
| Officer: | "[inaudible] . . . the use of force is complete." |

The officer can then be heard stating that Grizzle reported a knee injury, which had "already been seen by medical." A nurse arrives and asks Grizzle, "Do you have any injuries from the use of force?" Grizzle exclaims, "My knee hurts! I can't walk!" The nurse walks away from the door and says, "[inaudible] . . . he's refusing . . . [inaudible]." An officer then says, "Medical stated no injuries."[31] An officer reads a statement about decontamination procedures to Grizzle through the door. The video ends.

For screening purposes, Grizzle's allegations, taken as true, sufficiently state a claim for excessive force under the Eighth Amendment against Defendant McIntire. Indeed, Grizzle's alleges that Defendant McIntire employed force *after* Grizzle agreed to comply with the strip search order, despite having previously disobeyed McIntire's orders. *See* Compl. 20; Tr. 3:06:17–

---

[31] At the evidentiary hearing, Grizzle confirmed that he did not report "anything to [medical] as far as [his] condition or what [he] thought he needed." Tr. 3:08:54–:09:34.

:06:28; *cf. Brown v. Vasquez*, No. 5:14-CV-198-BG, 2015 WL 13662177, at *3 (N.D. Tex. Sept.

11, 2015) (dismissing at screening where "inmate was given numerous orders and refused to

comply with the orders before each burst of chemicals"); *Scarbough v. Halliburton*, No 2:99–CV–

0190, 2001 WL 283105, at *2 (N.D. Tex. Mar. 20, 2001) ("Consistent and escalating refusal to

cooperate, that is, refusal to comply with lawful orders, especially in the face of repeated warnings,

may justify some use of force."). And while the Court need not accept as true any allegations that

are shown to be plainly contradicted by the video, the video does not clearly contradict Grizzle's

allegations because his conversations with officers immediately before each administration of C.S.

gas are inaudible. *Cf. Gonzales v. Rowe*, No. 5:20-CV-052-BQ, 2020 WL 4811005, at *3 (N.D.

Tex. July 27, 2020) (dismissing use of force claim in part because the "video footage from the

incident show[ed] [inmate] refusing to comply with the Officers' repeated orders"). The Court

will require Defendant McIntire to file an answer, motion, or other responsive pleading regarding

this claim.[32]

## IV.   Conclusion

For the foregoing reasons it is, therefore,

**ORDERED** that the following claims are **DISMISSED with prejudice** for failure to state

a claim in accordance with 28 U.S.C. §§ 1915 and 1915A: (1) Grizzle's § 1983 claims against all

Defendants, **except for the excessive force claim against Defendant McIntire**, which survives

preliminary screening, and any claim against Defendant McIntire for property deprivation pursuant

---

[32] To the extent, however, that Grizzle attempts to bring an Eighth Amendment claim because Defendant McIntire allegedly "refused to allow [Grizzle] to decontaminate" (Compl. 36), such claim cannot proceed. Even though Grizzle may have preferred a shower, the video clearly shows Defendant McIntire provided Grizzle with decontamination instructions and Grizzle himself acknowledges that he was able to use the sink in his cell to wash himself. *See Amos v. Jefferson*, 861 F. App'x 596, 602 (5th Cir. 2021) (per curiam) (concluding deliberate indifference claims failed as a matter of law where defendants "explained to [offender] how to properly decontaminate using the running water available in his cell").

to or consistent with existing state policies, which is dismissed without prejudice; (2) ADA/RA claims against Defendants Jane Doe #2, John Doe #12, Hendricks, Baughman, Esquivel, Luna, Lozada, Ramirez, Reed, Ybarra, Sessions, Webb, Miller, Parker, and Collier, in both their individual and official capacities; and (3) ADA/RA claims for punitive damages against all Defendants.

This is a consent case assigned to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c) with authority to enter judgment. Any appeal shall be to the Court of Appeals for the Fifth Circuit under 28 U.S.C. § 636(c)(3). Dismissal of these claims does not release Grizzle or the institution where he is incarcerated from the obligation to pay any filing fee previously imposed. 28 U.S.C. § 1915(b)(1); *see also Williams v. Roberts*, 116 F.3d 1126, 1128 (5th Cir. 1997). Judgment shall be entered accordingly.

As to Grizzle's ADA/RA claims for compensatory damages and declaratory relief against TDCJ and the State of Texas, as well as the excessive force claim against Defendant Bryson McIntire, the Court concludes that these claims survive preliminary screening under 28 U.S.C. §§ 1915 and 1915A. These claims are the only surviving claims—all other claims asserted herein against any Defendant is dismissed. The Court directs TDCJ, the State of Texas, and Defendant McIntire to answer. Defendants shall be served and required to file an answer, motion, or other responsive pleading solely in response to these claims. The Court expresses no opinion as to the lawfulness of Defendants' alleged actions by identifying them or requiring an answer, and nothing in this Order constitutes an adverse finding as to their conduct.

It appears that TDCJ, the State of Texas, and Defendant McIntire are likely to be represented by the Office of the Attorney General for the State of Texas. It is, therefore, **ORDERED** that the Clerk of the Court shall transmit to the Attorney General a copy of this Order,

together with a copy of Plaintiff's Complaint or most recent amended complaint, and any supplements thereto, and a form to consent to proceed before a United States Magistrate Judge. The documents shall be transmitted by e-mail to the appropriate e-mail addresses at the Office of the Attorney General for the State of Texas. *See* Fed. R. Civ. P. 5(b)(2)(E).

It is **ORDERED** that TDCJ, the State of Texas, and Defendant McIntire shall have ***thirty (30) days*** from the date of service of this Order within which to answer or otherwise plead to Plaintiff's claims.

If TDCJ, the State of Texas, or Defendant McIntire will not be represented by the Attorney General's office, it is **ORDERED** that the Assistant Attorney General assigned to this case shall provide the Court with a notice representing the same, on or before the date on which Defendants' answer is otherwise due.

***No further motions or pleadings may be filed by Grizzle until after Defendants have answered or otherwise pleaded and the Court has entered its scheduling order.***

***All discovery is stayed until further notice.***

**SO ORDERED**.

Dated: October 31, 2022.

**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**